FILED

APR 1 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEX, INC. t/a LEX ON DEMAND        *
900 7th Street, N.W.
Washington, DC 20001                *

      **Plaintiff**               *

      **v.**                      *

DRIVEN, INC.                        *
6521 Arlington Boulevard
Falls Church, VA 22042              *

    **Serve On:**                  *
    **Edward Lippert**
    **Resident Agent**            *
    **7215 Poplar Street**
    **Arlington, Virginia 22003**  *

    **and**                       *

**Stephen Mole**                    *
**21926 Bayard Terrace**
**Broadlands, Virginia 20148**      *

      **Defendants**             *

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

Case: 1:07-cv-00708
Assigned To : Walton, Reggie B.
Assign. Date : 4/18/2007
Description: LEX INC. v. DRIVE INC.

## VERIFIED COMPLAINT

Plaintiff, LEX, Inc. t/a LEX On Demand ("LEX"), by its attorneys, hereby files suit against Defendants Driven, Inc. ("Driven") and Stephen Mole ("Mole"), and states as follows:

## THE PARTIES

1.    LEX is a Delaware corporation with its principal place of business in Washington, D.C. LEX provides reprographic and litigation support services to law firms and corporate clients in the Washington D.C. and the surrounding areas, as well as other states and cities.

2.      Upon information and belief, Driven is a Virginia corporation, with its headquarters and principal place of business in Virginia. Driven provides reprographic, print on demand, and litigation support services through a Washington, D.C. office and is a direct competitor of LEX in the markets in which they both operate.

3.      Mole is a resident of Virginia.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the Defendants pursuant to 28 U.S.C. §1332 as the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5.      Pursuant to 28 U.S.C. §1391, venue is proper in this judicial district as a substantial part of the events or omissions giving rise to the claim occurred herein.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

6.      On September 25, 2003, LEX hired Mole as a Sales Consultant in its Washington, D.C. Office.

7.      LEX is the premier nationwide document management and processing partner for law firms and legal departments seeking innovative, customized solutions along with service and support excellence in the Washington, D.C. area. LEX combines a perfect marriage of litigation support service offerings in one location: traditional paper discovery services, eDiscovery processing, collections and data harvesting, data repository and storage, blow-back to paper, imaging, OCR and coding, high volume copying, and print on demand.

8.      Mole's duties as a Sales Consultant included, but were not limited to, sales visits to existing and prospective customers; marketing, advertising and promotional efforts; estimating and bidding of jobs; and resolving customer complaints. Mole's sales territory included

Washington D.C., Arlington, Fairfax, Loudon, and Prince William Counties and the City of Alexandria, Virginia, and Montgomery, Prince George's, Howard, and Charles Counties, Maryland, with a primary focus on Washington, D.C.

9.    A key to LEX's success has been that it offers a consultative project management approach with a team that comes from the legal community charged with developing and monitoring the project from inception to completion. Through continuous feedback from its clients, LEX enhances and expands its solutions to meet client needs. LEX thus customizes the overall project from start to finish.

10.    LEX's processing protocols are established much like an apprenticeship where tasks need to be mastered before personnel can graduate to the next step. Although its processing must be standardized to maintain chain of custody and defensibility, its front end and back end creativity when working with unique data sets and project scenarios hallmarks LEX as a unique litigation solutions provider.

11.    A major factor in LEX's success is its people and how they interface in the work space. Workflow coordination is unique to every client and not imposed as a cookie cutter template. LEX personnel and processes blend into the project with the client. If the client likes LEX's approach, they adopt the processing methods and deliverable specifications for ongoing and future projects. If a change is required often as a result of a post mortem conducted by LEX (in which Mr. Mole would participate), suggestions are made for the next project or client.

12.    The litigation support industry continually wrestles with the commoditizing and standardization of electronic processing. LEX's proprietary software allows it the capability of making software adjustments to meet specific client needs. If, for instance, software is restricted from real time scripts to react to different demands, then an "off the shelf" software package

imposes limitations on the client's processing abilities and ultimately costs the client more on the back end as they try to handle the cookie cutter deliverable. LEX's people can tweak and utilize various tools to work through a solution while still maintaining defensibility. LEX's systems and software have a single backbone where various extensions run off this backbone allowing for married options to be employed in a networked menu set-up. This service platform affords LEX direct relationships and tie-ins to its billing, project status updates, and personnel time keeping, ultimately providing tools and records for LEX to make smarter business decisions by evaluating each project.

13.     Mole was one of LEX's top producing Sales Consultants in the Washington, D.C. office. As a Sales Consultant, Mr. Mole was intimately familiar with the full spectrum of LEX's services and capabilities. He also developed extensive personal contacts among LEX's law firm and corporate clients.

14.     Having Mole work for a competitor in any capacity poses a severe threat to LEX's competitive advantages. The inroads he made into various LEX clients that he served, the familiarity with the needs and idiosyncrasies he developed, the knowledge of ongoing and impending projects he acquired, and the personal relationships he established in providing services to those clients, will take time for LEX to replace. Taking that knowledge and experience to a competitor robs LEX of the good will it has paid to establish.

15.     As a condition and consideration of his employment, Mole executed an Employment Agreement with LEX dated September 25, 2003. A true and correct copy of that contract is attached hereto and incorporated herein as Exhibit 1.

16.     While employed by LEX, Mole had daily contact with customers for which he was responsible. Through such customer contact, Mole developed personal relationships with

4

persons who had purchasing responsibilities within the law firms with which they dealt. These

personal customer contacts are essential to LEX's business as it is these personal relationships

that LEX relies on and needs to retain in order to maintain its business. Generally, corporations

and law firms have designated persons within the firm that are responsible for purchasing and

determining copying services. Thus, these personal customer contacts are even more crucial in

LEX's particular business as in every organization there are a limited amount of potential clients.

17.    In paragraph 10(c), of Mole's Employment Agreement, attached as Exhibit 1,

Mole promised that, for a period of two years immediately following the termination of his

employment, he would not:

> (i) engage in any competing business activity within the Employee's
> assigned territory; or (ii) contact, cause to be contacted, or
> communicate with any specific accounts or customers for which
> Employee was responsible or whom Employee had contact during his
> or her employment with the Company.

18.    Paragraph 12(b) of Mole's agreement provides he is not to disclose LEX's

confidential information. Specifically, Mole agreed he would not:

> disclose Confidential Information to any third party, directly or
> indirectly, or use Confidential Information in any way that is
> adverse to the Company either during or for a period of five (5)
> years after the term of employment.

19.    Mole agreed that LEX would be entitled to an injunction in the event of a breach

of any provision of his Agreement, in addition to other remedies available to it.

20.    Mole further agreed and consented to the issuance of such an injunction without

the necessity for LEX to prove immediate, irreparable and/or actual damage.

21.    Mole further agreed that if LEX sought a restraining order,

injunction, or other relief and recovered such relief, Mole would reimburse LEX for its

attorneys' fees, court costs, and other costs incurred in obtaining the relief.

22.    Throughout his employment with LEX, Mole had direct and personal contact with the customers that he serviced and prospective customers that he solicited. Mole was expected to and did develop personal relationships with these customers on behalf of LEX and for LEX's benefit.

23.    On April 2, 2007, Mole resigned his position at LEX. On Mole's last day of employment with LEX, the President of LEX reiterated to Mole that he had a non-compete, in which he was prohibited from working for any company that competes with LEX within the area described in his agreement. When LEX's President asked Mole to assist the Company in introducing the new Sales Consultant that would take over his territory to Mole's former customers, Mole refused to comply. Mole advised LEX's President it would not be in his best interest to introduce the new Sales Consultant to his former customers, which indicates Mole's intention to compete. This intention has been confirmed by reports that Mole has been contacting Howrey, LLP ("Howrey") personnel, a LEX client, outside the Howrey building. Mole's Agreement expressly defines these activities with respect to Howrey as prohibited solicitation.

24.    Upon information and belief, Mole now works for Driven. In that capacity, Mole is directly or indirectly competing with LEX, in violation of his Agreement.

25.    Driven and Mole were aware of the provisions of Mole's Employment Agreement with LEX. Notwithstanding specific knowledge of the Agreement, and fully aware that any employment of Mole by Driven during the two year period following termination from LEX would violate that contract, Driven and Mole conspired to violate his Agreement by setting Mole up in a position at Driven to directly compete with LEX.

26.     Under the terms of Mole's employment agreement with LEX, Mole is prohibited from soliciting LEX customers for the benefit of Driven.

27.     After terminating his employment with LEX, Mole began competing activities. Among other things, Mole has been soliciting Howrey, LLP ("Howrey") personnel, a LEX customer, outside the Howrey building. Mole's Agreement expressly defines his activities with respect to Howrey as prohibited solicitation.

28.     On or about April 11, 2007, counsel for LEX wrote to Mole, and the President of Driven, Christine Francis, putting Driven and Mole on notice of Mole's Agreement.

29.     Despite these notices, Driven and Mole continue to violate the Agreement.

30.     On April 11, 2007, counsel for LEX notified the President of Driven, Christine Francis, of the fact that Mole had an Employment Agreement with LEX that prohibited his employment with Driven, and which requested that Ms. Francis, or counsel for Driven, contact LEX's counsel. On April 12, 2007, LEX, through counsel, forwarded to Ms. Francis a copy of Mole's Employment Agreement and reiterated the request to have someone contact LEX's counsel, advising Ms. Francis that LEX intended to be in court the first of the following week if satisfactory representations were not made by Driven. There was no response to either communication.

31.     LEX and Driven are competitors engaged in, among other things, duplicating, litigation support, print on demand, and eDiscovery services. Both companies market their services to the same customers, to assist firms and corporate entities in meeting their photocopy and electronic discovery needs. The litigation support business itself is highly competitive and most companies seek to protect themselves from employees leaving to go with a competitor by non-compete agreements.

## COUNT I - BREACH OF COVENANTS – STEPHEN MOLE

32.     Paragraphs 1 through 31 are hereby repeated and realleged as if fully set forth herein.

33.     In becoming employed by Driven, a direct competitor of LEX's, Mole breached paragraph 10(c) of his Agreement.

34.     Since becoming employed with Driven, Mole has embarked on a systematic and intentional course of conduct in violation of promises he made to LEX in his Agreement, with Driven's full knowledge, direction, and support.

35.     In violation of paragraph 10(c) of the Agreement, upon information and belief, Mole contacted and communicated with customers of LEX for the purpose of diverting those customers or accounts from LEX, for the benefit of Driven.  In further violation of paragraph 10(c), Mole began to promote, sell, or solicit orders for reprographic and litigation support services, and otherwise compete with LEX, directly and indirectly, by virtue of his employment with Driven.

36.     In violation of paragraph 10(c) of the Agreement, upon information and belief, Mole contacted LEX's customers for the purpose of soliciting those customers for the benefit of Driven.

37.     Despite the letter from undersigned counsel, Mole has, with the full knowledge, direction, and support of Driven, continued in his wrongful course of conduct in violation of his Agreement with LEX.

38.     The covenants contained in Mole's Agreement, at all relevant times, were reasonable as to the duration, geographic, and customer limitations, and were reasonably necessary to protect LEX's legitimate business interests in maintaining its customers.

39.     As a result of Mole's wrongful activities, upon information and belief, LEX already has lost customers, business, sales, profits, and good will, causing it irreparable harm for which there is no adequate remedy of law.

40.     Unless enjoined as requested in this Complaint, Mole will continue his wrongful and unlawful activities, and LEX will continue to sustain damages, causing it irreparable harm for which there is no adequate remedy at law.

WHEREFORE, LEX requests that this Court:

(1)     order a preliminary and permanent injunction prohibiting Mole, for a two year period from issuance of the order, from directly or indirectly, for himself or on behalf of others, including any person, partnership, firm, corporation, or other entity:

    a.     from engaging in any competing business activity within Washington D.C., Arlington, Fairfax, Loudon, and Prince William Counties and the City of Alexandria, Virginia, and Montgomery, Prince George's, Howard, and Charles Counties, Maryland,

    b.     from directly or indirectly contacting, in any manner, any of LEX's customers or any of its affiliates' or subsidiaries' customers for the purpose of soliciting and/or providing to any such customers any information relating to any service or product offered by LEX, or actually soliciting, diverting, or taking away any such customers of LEX or its affiliates or subsidiaries;

(2)     order a preliminary and permanent injunction prohibiting Mole, for a five (5) year period from issuance from directly or indirectly divulging, disclosing or communicating to any person, firm, corporation, or other entity any information concerning any matters affecting or relating to LEX, including without limitation, any of LEX's customers, the prices LEX obtains

or has obtained for sale of goods and services, LEX's trade secrets, advertising, or other business information, LEX's manner of operation, plans, processes, or other like information;

(3)     award LEX damages in an amount to be proved at trial;

(4)     award to LEX its costs, court costs, attorneys' fees, and such other and further relief as justice may require.

## COUNT II - INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS OR ECONOMIC RELATIONS – STEPHEN MOLE

41.     Paragraphs 1 through 31 are hereby repeated and realleged as if fully set forth herein.

42.     LEX had both an existing business relationship and an expectancy of future economic benefit relative to its customers at the time Mole left LEX.

43.     Mole knew that LEX had both an existing business relationship and an expectancy of future economic benefit relative to its customers at the time he left LEX.

44.     Absent Mole's intentional conduct in soliciting LEX's customers in violation of his Agreement with LEX, LEX would have continued in the business relationship and realized future economic benefit relative to its customers.

45.     As a direct result of Mole's intentional conduct, LEX has suffered damages, inclusive of lost customers, business, sales, profits and good will.

WHEREFORE, LEX requests that this Court:

(1)     award LEX damages in an amount to be proved at trial;

(2)     award to LEX its costs, court costs, attorneys' fees, and such other and further relief as justice may require.

## COUNT III - TORTIOUS INTERFERENCE WITH CONTRACT – DRIVEN, INC.

46.   Paragraphs 1 through 31 are hereby repeated and realleged as if fully set forth herein.

47.   Driven had actual knowledge of Mole's Agreement, including the non-solicitation and non-compete clauses contained in the Agreement, at all relevant times.

48.   Despite this knowledge, Driven permitted, encouraged, and/or directed Mole to breach paragraphs 10(c) and 12(b) of his Agreement, by directly or indirectly contacting, soliciting, and selling to customers of LEX with which he had contact while employed at LEX.

49.   By the conduct described in this Complaint, which was intentionally and improperly induced by Driven, Mole has breached his contractual obligations to LEX.

50.   As a result of Driven's intentional and improper interference, LEX has suffered damages inclusive of lost customers, business, sales, profits, and good will.

51.   Unless enjoined as requested in this Complaint, Driven will continue in its wrongful and unlawful conduct, and LEX will continue to sustain damages, causing it irreparable harm for which there is no adequate remedy of law.

WHEREFORE, LEX requests that this Court:

(1)   order a preliminary and permanent injunction prohibiting Driven from in any way permitting or using the services of Mole, for a two year period from issuance, to:

a.   directly or indirectly contact any of LEX's customers for the purpose of diverting any of the accounts or business from LEX;

b.   directly or indirectly promote, sell, or solicit orders for reprographics and other litigation support services, including but not limited to eDiscovery and print on demand or otherwise compete with LEX or any of its subsidiaries or affiliates with respect to reprographic,

litigation support, eDiscovery, and print on demand services within Washington D.C., Arlington,

Fairfax, Loudon, and Prince William Counties and the City of Alexandria, Virginia, and

Montgomery, Prince George's, Howard, and Charles Counties, Maryland;

        c.    directly or indirectly contact, in any manner, any of LEX's customers or

any of its affiliates' or subsidiaries' customers for the purpose of soliciting and/or providing to

any of such customers any information relating to any service or product offered by LEX, or

actually solicit, divert, or take away any such customers of LEX or its affiliates or subsidiaries;

     (2)    order a preliminary and permanent injunction prohibiting Driven from in any way

permitting or using the services of Mole, for a five (5) year period from issuance, to directly or

indirectly divulge, disclose, or communicate to any person, firm, corporation, or other entity any

information concerning any matters affecting or relating to LEX, including without limitation,

any of LEX's customers, the prices LEX obtains or has obtained for sale of goods and services,

LEX's trade secrets, advertising, or other business information, LEX's manner of operation,

plans, processes, or other like information;

     (3)    award to LEX compensatory damages for Mole's breaches of the covenants

contained in his Agreement;

     (4)    order an accounting by Driven of all sums received by it with respect to all

business conducted since Mole joined the Company;

     (5)    award to LEX costs, and such other and further relief as justice may

require.

## COUNT IV - INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS OR ECONOMIC RELATIONS – DRIVEN, INC.

    52.    Paragraphs 1 through 31 are hereby repeated and realleged as if fully set forth

herein.

53.    LEX had both an existing business relationship and an expectancy of future economic benefit relative to its customers.

54.    Driven knew that LEX had both an existing business relationship and an expectancy of future economic benefit relative to its customers.

55.    Absent Driven's intentional conduct via Mole's solicitation of LEX's customers, LEX would have continued in the business relationship and realized future economic benefit relative to its customers.

56.    As a direct result of Driven's intentional conduct, LEX has suffered damages, inclusive of lost customers, business, sales, profits and good will.

WHEREFORE, LEX requests that this Court:

(1)    award LEX damages in an amount to be proved at trial;

(2)    award to LEX its costs, court costs, attorneys' fees, and such other and further relief as justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff, LEX, Inc. t/a LEX On Demand, requests this matter be scheduled before a jury.

Respectfully submitted,

Francis R. Laws (Bar No. 2596)
Sara A. Levinson (Bar No. 26082)
THOMAS & LIBOWITZ, P.A.
100 Light Street, Suite 1100
Baltimore, MD 21202-1053
(410) 752-2468
Fax: (410) 752-0979

Attorneys for Plaintiff
LEX, Inc. t/a LEX On Demand

13

## **VERIFICATION**

I swear and affirm that the averments of the foregoing paper are true and correct to the best of my knowledge, information, and belief.

Apr 17, 2007
_____
DATE

_____
DAVID TOMASHEFSKI

14

**FILED**

APR 1 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), made as of _September 25ᵗʰ_____, 20_03_, by and between Lex, Inc., a Delaware corporation with its principal office at 1225 New York Avenue, N.W., Washington, D.C. 20005 (the "Company") and Stephen Mole, an individual residing at _1600 Spring Gate Dr #2312, McLean VA 22102_____ (the "Employee").

    1.    <u>Definitions.</u>

        a.    Customer or account, as used herein, shall mean the business entity with whom the Company transacts business.

        b.    Customer contact or account contact, as used herein, shall mean the individual representative, employee, partner, principle, or agent of a customer or account with whom Employee interacts in transacting business or soliciting business.

        c.    Contact or communication, as used herein, shall mean intercourse of any kind between the Employee and another individual(s), whether, verbal, written, or otherwise, for the purpose of providing copy services or the solicitation of copy services.

        d.    Assigned Territory, as used herein, shall mean the Washington, DC Metropolitan Area, including the District of Columbia and Arlington, Fairfax, Loudon and Prince William Counties and the City of Alexandria, Virginia and Montgomery, Prince Georges, Howard and Charles Counties, Maryland.

    2.    <u>Employment.</u>  The Company, which includes all subsidiaries and affiliates, employs the Employee and the Employee accepts employment upon the terms and conditions of this Agreement.  If the Employee is promoted, demoted, transferred, or re-assigned to another position, this Agreement survives that employment action.

    3.    <u>Term.</u>  This Agreement shall be terminable at the will of each party. Employee shall provide fourteen (14) days advance written notice to the Company when employee desires to terminate the employment relationship.  Employee shall be entitled to compensation only for such time as Employee provides full-time and exclusive services to the Company, as described herein.  If Employee elects to terminate employment, the Company, at its option, may immediately terminate Employee's employment without allowing for the additional fourteen (14) days to elapse.

4.    Compensation. In consideration of the services to be rendered by the Employee under this Agreement, the Company shall pay the Employee the amount set forth in Exhibit A attached hereto and made a part hereof. Such compensation shall be subject to withholding and other applicable taxes. Employee's compensation may be increased or decreased by the Company, at the sole discretion of the Company.

5.    Duties. The Company shall employ the Employee as a Sales Consultant. Employee shall comply with the obligations set forth in this Agreement and with Company policy, whether or not reduced to writing, to the extent Company policy is not inconsistent with the terms of this Agreement. Employee's primary duty shall be to assist the Company in becoming the best, most successful, copy services provider in the Employee's Assigned Territory. Employee's duties therefore include all tasks, assignments, and activities in furtherance of the primary duty. Employee will be responsible for, among other things, developing a sales and marketing plan for the assigned territory; soliciting new business with existing customers; soliciting new business from new customers; making sales calls and visits to existing customers and prospective new customers; coordinating job pick-ups and deliveries with Account Managers; performing job pick-ups and deliveries when necessary; resolving customer complaints; assisting all Company employees in providing the highest level of customer service; and all other duties required by the Company. It is expressly understood that Employee's communications with any customer contact, including partners, principles, employees, agents, and representatives of any account, have as their ultimate purpose or goal the solicitation and/or servicing of all of the copy service business of that account for the Company in furtherance of Employee's duties hereunder.

6.    Duty of Loyalty. The Employee shall devote his or her entire time, energy and attention to the Employer's business. During the term of employment, Employee agrees not to engage in any other business activity, regardless of whether it is pursued for gain or profit. Employee further agrees not to pursue or be connected with any business which is in competition with the Company or its affiliates or subsidiaries during the term of employment.

7.    Sales Subject to Acceptance. All sales made by Employee shall be made subject to acceptance by the Company, and all contracts for the Company's services shall be executed by a duly authorized officer of the Company. No credit or other financial decisions relating to the Company's sales or business shall be made by Employee.

8.    Probationary Period. All new employees are hired on a ninety (90) day probationary basis. The Company may, however, extend the probationary period up to an

additional ninety (90) days. Employee will be informed if the probationary period is to extend beyond the first ninety (90) days. In addition, the probationary period will be extended by the number of days Employee is absent from scheduled work while in a probationary status. Employee may choose to resign, or may be terminated by the Company, without notice at any time during the probationary period. Upon termination, a probationary employee will be paid the pay earned to the date of termination. An employee who successfully completes the probationary period is entitled to the benefits of a regular (non-probationary) employee. However, employment is terminable by either the Company or Employee at any time, at will, both before and after the probationary period. Employee will not be paid for absences that occur during the probationary period or the extended probationary period.

9.    <u>Representations and Warranties</u>. Employee represents and warrants that he or she is not a party to any agreement with any third party containing a non-competition provision or other restriction that would preclude any part or all of Employee's employment with the Company or any of the services which Employee will provide to the Company. Moreover, Employee represents and warrants that he or she is not limited by any court order or other obligation from performing all assigned duties for the Company. Employee understands that this is a condition precedent to any employment offered by the Company and that Employee agrees herein that he or she will indemnify and hold harmless the Company for any legal action taken against the Company as the result of any agreement with a prior employer, including reimbursing the Company for any legal expenses incurred in defending such action.

10.    <u>Covenant Not to Compete</u>.

a.    The Company undertakes to train and to continue to train Employee and to impart to Employee confidential information and knowledge about the Company's business strategies and policies, accounts, customer lists, trade secrets, procedures, and methods. The Company has established a valuable and extensive business in its service, which business has been developed at a considerable expense to the Company. The nature of the business is such that the customer relationships and goodwill that the Company has developed must be maintained through close personal contact of its Employees with the contact person(s) at the particular account or customer.

b.    By virtue of Employee's employment with the Company, Employee will become familiar with and have access to the manner, methods, trade secrets, and confidential information pertaining to the Company's business, and with the names and lists of customers and customer contacts. During Employee's employment with the Company, Employee is being compensated in part for developing and maintaining

-3-

relationships and good will with customers, prospective customers, customer contacts, and prospective customer contacts of the Company. It is understood that Employee will become personally acquainted with the Company's customers, their business requirements, the amount paid by them for the Company's services, and the contact persons at the particular account or customer.

c.    For a period of two (2) years after the termination of employment, whether with or without cause, whether voluntary or involuntary, the Employee shall not, either directly or indirectly, on Employee's own behalf or in the service of or on behalf of others, (i) engage in any competing business activity within the Employee's assigned territory; or (ii) contact, cause to be contacted, or communicate with any specific accounts or customers for which Employee was responsible or whom Employee had contact during his or her employment with the Company. Such contact is prohibited only to the extent that it is adverse to the interests of the Company or would benefit or potentially benefit any competitor or potential competitor of the Company, and further, nothing contained herein shall prevent Employee from engaging in any activity that is not competitive with the business then being conducted by the Company. Employee understands and agrees that the Company has a legally protectable interest in the relationships and good will it has developed with its customers through Employee and other employees, in the relationships and good will it has developed with individual contact persons at each of its customers, in its customers themselves and its business with them, including that business which the Employee developed or for which the Employee had responsibility.

d.    In the event of a breach of any provision of Section 10 by Employee, Employee agrees that the Company shall be entitled to an injunction prohibiting conduct in breach of this Agreement. Employee acknowledges and agrees that a breach of Section 10 will result in immediate, actual, irreparable injury to the Company. Employee further acknowledges and agrees that it is impossible to determine with any reasonable accuracy the financial injury that could and/or would result by actions in breach of Section 10.

e.    It is understood and agreed that part of the consideration for Employee's employment and/or continued employment with the Company is this Agreement not to compete. It is also understood and agreed that one goal of the period of non-competition is to allow the Company to re-establish the personal relationships with customers and customer contacts developed and/or nurtured by Employee during his or her employment with the Company. In the event of a breach of Section 10 by the Employee, the Company shall be entitled to liquidated damages as defined herein. For each customer or account of the Company that Employee contacts, causes to be contacted, or otherwise works with or for in violation of this Section 10, Employee shall pay to the Company liquidated damages in the amount of the average monthly billing by the

-4-

Company to that customer or account times the number of months remaining in Employee's Covenant Not to Compete, to be determined from the date of the initial contact made by the Employee to that customer or account. The average monthly billing shall be the average billing to that customer or account by the Company's office where Employee worked during the twelve (12) months preceding Employee's termination. The parties agree that it is impossible to ascertain with any reasonable accuracy the amount of prospective damages to the Company resulting from a breach by the Employee of this Section 10, which damages would include business lost to the Company for a period of time well beyond the two year term specified in this Section 10. The parties further agree that the damages set forth above are reasonable, and not a penalty, based upon a conservative estimate of the value, or a portion of the value, of the loss of the customer or account in question, in addition to a loss of good will.

11.    Non-Solicitation of Employees.

a.    For a period of two (2) years after the termination of employment, whether with or without cause, whether voluntary or involuntary, the Employee shall not, either directly or indirectly, on Employee's own behalf or in the service of or on behalf of others, solicit, divert, recruit or employ any employee of the Company, including any of its subsidiaries or affiliates.

b.    In the event of a breach of this Section 11 by the Employee, the Company shall be entitled to liquidated damages as defined herein. For each former employee of the Company solicited, diverted, recruited, or employed or caused to be in violation of this Section 11, Employee shall pay the Company liquidated damages for each account or customer of the Company which such former employee handled for the Company during the two (2) years immediately preceding termination of that former employee and which customer or account the former employee contacts or otherwise services or works with for the benefit of Employee or anyone in privity with Employee. The liquidated damages for each such account or customer shall be (i) the amount of billings by the Company to the customer or account during the twelve (12) months immediately preceding termination of such former employee with the Company, and (ii) the amount of the first six (6) months' salary paid to the replacement(s) for the former employee. If the former employee was not in a position to have accounts, Employee shall pay the Company the amount of the first six (6) months' salary paid to the replacement(s) for the former employee.

c.    The parties agree that it is impossible to ascertain with any reasonable accuracy the amount of prospective damages to the Company resulting from a breach by the Employee of this Section 11. The loss of an employee creates a hardship

-5-

and burden on the Company, for which the Company suffers substantial harm. The Company must expend funds to search for a replacement employee and train that employee. Further, the loss of the overall efficiency of the office as the result of an employee leaving cannot be quantified. Consequently, the parties agree that the liquidated damages set forth above are reasonable, and not a penalty, based upon a conservative estimate of the value, or a portion of the value, of the former employee to the Company.

   d.   In the event of a breach of any provision of Section 11 by Employee, Employee agrees that the Company shall be entitled to an injunction prohibiting conduct in breach of this Agreement. Employee acknowledges and agrees that a breach of Section 11 will result in immediate, actual, irreparable injury to the Company. Employee further acknowledges and agrees that it is impossible to determine with any reasonable accuracy the financial injury that could and/or would result by actions in breach of Section 11.

12.   <u>Non-Disclosure of Confidential Information.</u>

   a.   The Company is committed to preserving and protecting confidential and proprietary information and trade secrets (collectively "Confidential Information") to the full extent permitted by law. During the term of employment, Employee will have access to and become familiar with such Confidential Information of the Company. All confidential information is the exclusive property of the Company. Confidential Information includes, but is not limited to, devices, secret inventions, processes and compilations of information, records, specifications, customer lists, price lists, customer proposals, advertising and marketing plans, business plans, all computer information designed by or developed for the Company, or any confidential knowledge or secrets with respect to the business of the Company.

   b.   In consideration of employment, Employee acknowledges an obligation not to disclose Confidential Information to any third party, directly or indirectly, or use Confidential Information in any way that is adverse to the Company, either during or for a period of five (5) years after the term of employment. Use of Confidential Information during the term of employment is restricted to that use necessary for the performance of Employee's duties.

   c.   Upon termination of employment, Employee shall return to the Company all Confidential Information, including, but not limited to, data, records, customer and product lists, notes, correspondence, or any other documents or copies thereof, which came into Employee's possession and are related to the Company's business.

13.    <u>Injunctive Relief</u>. To the extent permissible by law, the Company shall be entitled to injunctive or other equitable relief in the event of a breach or threatened breach by Employee of any of the covenants contained in this Agreement.

14.    <u>Waiver of Breach</u>. The failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be construed as thereafter waiving any such terms and conditions, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

15.    <u>No Assignment</u>. This Agreement and the rights, interests and benefits hereunder shall not be assigned, transferred, pledged, or hypothecated in any way by Employee or any executor, administrator, heir, legatee, distributee, or other person claiming under Employee and shall not be subject to execution, attachment, or similar process. Any attempt by Employee to assign, transfer, pledge, or hypothecate or otherwise dispose of this Agreement or such rights, interest and benefits, or the levy of any attachment or similar process thereupon shall be null and void and shall relieve the Company of any and all liability hereunder.

16.    <u>Attorney's Fees</u>. If the Employee makes a claim against the Company associated in any way with his employment at the Company and the Company prevails, in whole or in part, on that claim, or if the Company succeeds in whole or in part in a claim against Employee for breach of this Agreement, the Company is entitled to recover reasonable attorney's fees and other litigation costs, including costs associated with retaining the services of expert witnesses.

17.    <u>Severability and Reformation</u>. If any provision of this Agreement is held invalid by a court of competent jurisdiction, such holding will not invalidate any of the other provisions herein, as it is intended that the provisions of this Agreement shall be severable and that the invalidity of one shall not invalidate the others. Notwithstanding the foregoing, if it should ever be held that any provision contained herein does not contain reasonable limitations as to time, geographical area, or scope of activity to be restrained, then the court so holding shall, at the request of the Company, reform such provisions to the extent necessary to cause them to contain reasonable limitations as to time, geographical area and scope of activity to be restrained and to give maximum permissible effect to the intentions of the parties as set forth herein, and the court shall enforce such provisions as reformed.

18.    <u>Governing Law</u>. It is agreed by the parties that the law of the State of

-7-

Maryland will govern the interpretation, validity, and effect of this Agreement.

19.    <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, and by the parties by separate counterpart, each of which shall be deemed an original and all of which together shall constitute one instrument.

20.    <u>Entire Agreement</u>.  This Agreement supercedes any prior Agreements between the Employee and the Company, as well as any other statements or representations of any kind.  Employee and the Company hereby agree that this Agreement constitutes the entire agreement between the parties with respect to Employee's employment with the Company.  No changes or amendments to this Agreement shall be effective unless in writing and signed by both parties.  This Agreement shall bind the parties, their successors and assigns.

IN WITNESS WHEREOF, the parties have affixed their signatures to this Agreement to be effective on the day and year first written above.

LEX, INC.                                          EMPLOYEE

By: _____        _____

Name:  Kathleen A. Maloney          Name:  Stephen P. Mole

Date:  9/25/03                                Date:  9/25/03

-8-

07-708
RBW

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

LEX, INC. t/a LEX ON DEMAND
900 7th Street, N.W., Washington, DC 20001

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   D.C.
(EXCEPT IN U.S. PLAINTIFF CASES)   11001

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Francis R. Laws and Sara A. Levinson
Thomas & Libowitz, P.A.
100 Light Street, Suite 1100
Baltimore, MD 21202; (410) 752-2468

## DEFENDANTS

DRIVEN, INC.
6521 Arlington Blvd., Falls Church, VA 22042

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Fairfax
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF

Case: 1:07-cv-00708
Assigned To : Walton, Reggie B.
Assign. Date : 4/18/2007
Description: LEX INC. v. DRIVE INC.

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ◉ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE an x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ◉ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

- ○ **A.** *Antitrust*
  - ☐ 410 Antitrust

- ○ **B.** *Personal Injury/ Malpractice*
  - ☐ 310 Airplane
  - ☐ 315 Airplane Product Liability

- ○ **C.** *Administrative Agency Review*
  - ☐ 151 Medicare Act
  - **Social Security:**
    - ☐ 861 HIA ((1395ff)
    - ☐ 862 Black Lung (923)
    - ☐ 863 DIWC/DIWW (405(g)
    - ☐ 864 SSID Title XVI
    - ☐ 865 RSI (405(g)
  - **Other Statutes**
    - ☐ 891 Agricultural Acts
    - ☐ 892 Economic Stabilization Act
    - ☐ 893 Environmental Matters
    - ☐ 894 Energy Allocation Act
    - ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

- ◉ **D.** *Temporary Restraining Order/Preliminary Injunction*

  Any nature of suit from any category may be selected for this category of case assignment.

  *(If Antitrust, then A governs)*

- ○ **F.** *Pro Se General Civil*

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

28 USC 158
awal 28 USC 157
ns
Penalty
nus & Other
ights
Condition
ights
mark
its
US plaintiff or
lant
hird Party 26
7609

Court Name: District of Columbia
Division: 1
Receipt Number: 4615003672
Cashier ID: dcallis
Transaction Date: 04/18/2007
Payer Name: THOMAS LIBOWITZ PA

CIVIL FILING FEE
For: THOMAS LIBOWITZ PA
Amount: $350.00

Check/Money Order Num: 15512
Amt Tendered: $350.00

Total Due: $350.00
Total Tendered: $350.00
Change Amt: $0.00

07-0708

Only when the bank clears the
check, money order, or verifies
credit of funds is the fee or debt
officially paid or discharged. A
$45 fee will be charged for a
returned check.

| | | | |
|---|---|---|---|
| **G. Habeas Corpus/ 2255** | **H. Employment Discrimination** | **I. FOIA/PRIVACY ACT** | **J. Student Loan** |
| ☐ 530 Habeas Corpus-General <br> ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act <br> ☐ 890 Other Statutory Actions (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| | | | |
|---|---|---|---|
| **K. Labor/ERISA (non-employment)** | **L. Other Civil Rights (non-employment)** | **M. Contract** | **N. Three-Judge Court** |
| ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Mgmt. Relations <br> ☐ 730 Labor/Mgmt. Reporting & Disclosure Act <br> ☐ 740 Labor Railway Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) <br> ☐ 443 Housing/Accommodations <br> ☐ 444 Welfare <br> ☐ 440 Other Civil Rights <br> ☐ 445 American w/Disabilities-Employment <br> ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholder's Suits <br> ☐ 190 Other Contracts <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Breach of covenants, tortious interference

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND:   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE   April 17, 2007    SIGNATURE OF ATTORNEY OF RECORD   *(signature)*

JC

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.