FILED

APR 1 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEX, INC. t/a LEX ON DEMAND          *

     **Plaintiff**                        *

     **v.**                              *

DRIVEN, INC., et al.                 *

     **Defendants**                      *

Case: 1:07-cv-00708
Assigned To : Walton, Reggie B.
Assign. Date : 4/18/2007
Description: LEX INC. v. DRIVE INC.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

Plaintiff LEX, Inc. t/a LEX On Demand ("LEX"), by counsel, and pursuant to Rule 65 of the Federal Rules of Civil Procedure, moves for entry of a temporary restraining order, to be followed by a preliminary injunction, in order to preserve status quo and prevent further irreparable harm from the wrongful actions of Defendants Driven, Inc. and Stephen Mole.

Plaintiff respectfully submits that a temporary restraining order should be granted as it clearly appears from specific facts shown by affidavit that immediate, substantial, and irreparable harm will result to Plaintiff.

In support of this Motion, the Court's attention is respectfully invited to view the Memorandum of Law in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, and all accompanying exhibits, filed contemporaneously herewith and incorporated by reference herein.

WHEREFORE, Plaintiff respectfully requests that its Motion for Temporary Restraining Order and Preliminary Injunction be granted.

Respectfully submitted,

Francis R. Laws (Bar No. 2596)
Sara A. Levinson (Bar No. 26082)
THOMAS & LIBOWITZ, P.A.
100 Light Street, Suite 1100
Baltimore, MD 21202-1053
(410) 752-2468
Fax: (410) 752-0979

Attorneys for Plaintiff
LEX, Inc. t/a LEX On Demand

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of April 2007, a copy of the foregoing Motion

for Temporary Restraining Order and Preliminary Injunction, Supporting Memorandum of Law,

and proposed Order was served, via hand delivery on Sam S. Garbia, Esquire and James Martin,

Esquire, Garbia & MacGregor, LLP, 4151 Chain Bridge Road, Fairfax, Virginia 22030,

Attorneys for Defendants.

Sara A. Levinson

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LEX, INC. t/a LEX ON DEMAND | * | |
| Plaintiff | * | |
| v. | * | CIVIL ACTION NO. |
| DRIVEN, INC., et al. | * | |
| Defendants | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I.    INTRODUCTION

LEX, Inc. t/a LEX On Demand ("LEX"), seeks injunctive relief from the Court in order to preserve the status quo and prevent further irreparable harm from the wrongful actions of the Defendants, Driven, Inc. ("Driven") and Stephen Mole ("Mole"). Specifically, LEX seeks to enjoin its former employee from violating contractual obligations to LEX with respect to soliciting LEX's customers. The requested relief is narrow. It only seeks to enjoin the former employee to do that which he was already contractually obligated to do. LEX also seeks to require Mole to change the cell phone number he uses, as LEX paid for Mole's use of that number for business purposes and LEX's customers thus have it in their LEX contact information.

LEX is the premier nationwide document management and processing partner for law firms and legal departments seeking innovative, customized solutions along with service and support excellence in the Washington, D.C. area. Defendant Mole is a former employee of LEX in LEX's Washington, D.C. office. Mole had an employment agreement with LEX that prohibits

him from engaging in competing activities by working for a LEX competitor and by soliciting and/or doing business with LEX customers, for two years following the termination of his employment with LEX.

On April 2, 2007, Mole resigned his position with LEX. During his exit interview, he communicated almost directly his intention to compete with LEX. Subsequently, Mole accepted employment with Driven, which directly competes with LEX.

Driven has tortiously interfered with Mole's agreement by aiding, encouraging, and inducting Mole to solicit LEX's customers in breach of his agreement with LEX. Driven is well aware of Mole's agreement with LEX, yet it continues to assist and encourage Mole in the violation of his agreement. Indeed, despite repeated attempts to communicate with Driven on this issue, Driven refuses to even acknowledge LEX's existence. By letter dated April 13, 2007, counsel for Mole advised LEX that Mole was employed by Driven, which directly competes with LEX.

LEX has been and will be severely damaged by Defendants' breaches and tortious conduct. Unless the Defendants' conduct is enjoined, LEX's damages and harm will continue, its customers and good will shall be jeopardized, and its business irreparably damaged. A temporary restraining order should therefore be issued prohibiting Mole from breaching his Employment Agreement, and also enjoining Driven from aiding, encouraging, and inducing Mole to solicit LEX's customers, until a hearing on the merits of LEX's claim can be held.

## II.   **FACTUAL BACKGROUND**

On September 25, 2003, LEX hired Mole as a Sales Consultant in its Washington, D.C. office. Mole Employment Agreement, Ex. 4. Mole's duties as a Sales Consultant included, but were not limited to, sales visits to existing and prospective customers; marketing, advertising,

and promotional efforts; estimating and bidding of jobs; and resolving customer complaints. Id. Mole's sales efforts focused on promoting LEX's litigation support services, eDiscovery, print on demand, and reprographic services. Mole's sales territory included Washington D.C., Arlington, Fairfax, Loudon, and Prince William Counties and the City of Alexandria, Virginia, and Montgomery, Prince George's, Howard, and Charles Counties, Maryland. Employment Agreement, Ex. 4.

As a condition and consideration of his employment, Mole executed an Employment Agreement with LEX dated September 25, 2003. Ex. 4. While employed by LEX, Mole had daily contact with customers for which he was responsible. Through such customer contact, Mole developed personal relationships with persons who had purchasing responsibilities within the law firms and businesses with which he dealt. These personal customer contacts are essential to LEX's business as it is these personal relationships that LEX relies on and needs to retain in order to maintain its business.

LEX reimbursed Mole for a portion of his cellular telephone service each month. For years, customers telephoned Mole on his cellular telephone in order to contact Mole for LEX service calls. LEX has a protectable interest in that number and asks the Court to require Mole to change the number with his service provider.

LEX and Driven are competitors engaged in the reprographic services, litigation support services, eDiscovery, and commercial print on demand services in the area covered by Mole's agreement with LEX. Tomashefski Aff., Ex. 1. Both companies market their services to law firms and corporate clients, to assist companies in meeting their litigation support and print on demand needs. See Driven Website, Ex. 2. The business itself is highly competitive and most

companies seek to protect themselves from employees leaving to go with a competitor by non-compete agreements.

On April 2, 2007 Mole resigned from LEX. At the time, he was one of LEX's top producers in the D.C. Metropolitan area. In the course of announcing his resignation, the President of LEX, David Tomashefski, interviewed Mole. During the interview, Mr. Tomashefski reminded Mole of the non-compete provisions of his contract. Mr. Tomashefski further attempted to enlist Mole's cooperation in introducing Mole's replacement to Mole's customers. Mole unequivocally communicated his intent to violate his employment contract by advising Mr. Tomashefski that introducing a LEX person to his former clients was not in his best interest.

Thereafter, LEX learned that Mole may be employed by Driven. Accordingly, counsel for LEX put both Driven and Mole on notice that LEX intended to enforce its contract with Mole. Driven did not, and has not, responded to that communication. On April 13, 2007, counsel for Mole confirmed to LEX that Mole was employed by Driven.

The industry in which LEX and Driven are engaged is highly competitive. Businesses typically have wide latitude in deciding which company to use for their litigation support and print on demand needs. Developing and maintaining personal relationships with the representatives who make the decision as to what copy and printing company to use is critical. To initiate and foster these personal relationships, LEX encourages its Sales Consultants to spend time with the critical contact people, to invite them to happy hours sponsored by LEX and occasionally to sporting events. LEX's Sales Consultants are also encouraged to distribute small gifts to customers and prospective customers which are purchased by LEX.

When Sales Consultants are hired by LEX, they are assigned specific areas to serve and market. The Sales Manager and/or Managing Partner of the office conducts regular meetings with the Sales Consultants. Anderson Aff., Ex. 3. At these meetings, the Sales Consultants share information with respect to contacts within businesses, and thoughts on how to approach and solicit new or more business. Id. As a result, each Sales Consultant is exposed to extremely confidential information about the customers and contacts of the entire office. Some of the business information to which the Sales Consultants are exposed is extremely confidential and proprietary. Id.

Mole expressly recognized the special, unique services he would be providing to the Company in his Employment Agreement. Specifically, the agreement provides, in pertinent part:

> a. The Company undertakes to train and to continue to train Employee and to impart to Employee confidential information and knowledge about the Company's business strategies and policies, accounts, customer lists, trade secrets, procedures, and methods. . .The nature of the business is such that the customer relationships and goodwill that the Company has developed must be maintained through close personal contact of its Employees with the contact person(s) at the particular account or customer.

> b. By virtue of Employee's employment with the Company, Employee will become familiar with and have access to the manner, methods, trade secrets, and confidential information pertaining to the Company's business, and with the names and lists of customers and customer contacts. During Employee's employment with the Company, Employee is being compensated in part for developing and maintaining relationships and good will with customers, prospective customers, customer contacts, and prospective customer contacts of the Company. It is understood that Employee will become personally acquainted with the Company's customers, their business requirements, the amount paid by them for the Company's services, and the contact persons at the particular account or customer.

Employment Agreement at ¶10(a) and (b), Ex. 4.

Because of the close customer contact afforded to Mole by virtue of his employment, the

Employment Agreement executed by Mole contained several covenants prohibiting him from

doing business with LEX customers.

In paragraph 10(c) of Mole's Employment Agreement, Mole promised that, for a period

of two years immediately following the termination of his employment, he would not:

> (i) engage in any competing business activity within the
> Employee's assigned territory; or (ii) contact, cause to be
> contacted, or communicate with any specific accounts or
> customers for which Employee was responsible or whom
> Employee had contact during his or her employment with the
> Company.

This limitation on the employee's activities following termination of employment are

further narrowed by the contract to activities that are "adverse to the interests of the Company or

would benefit or potentially benefit any competitor or potential competitor of the Company. . . ."

Id.

Paragraph 12(b) of Mole's agreement provides that he is not to disclose LEX's

confidential information.  Specifically, Mole agreed he would not:

> disclose Confidential Information to any third party, directly or
> indirectly, or use Confidential Information in any way that is
> adverse to the Company, either during or for a period of five (5)
> years after the term of employment.

Mole was one of LEX's top producing Sales Consultants in the Washington, D.C. office.

Anderson Aff., Ex. 3.  As a Sales Consultant, Mole was intimately familiar with the full

spectrum of LEX's services and capabilities.  Id.  He also developed extensive personal contacts

among LEX's law firm and corporate clients.  Id.  Having Mole work for a competitor in any

capacity poses a severe threat to LEX's competitive advantages.  Id.  The inroads he made into

various LEX clients that he served, the familiarity with the needs and idiosyncrasies he

developed, the knowledge of ongoing and impending projects he acquired, and the personal relationships he established in providing services to those clients, will take time for LEX to replace. Id. Taking that knowledge and experience to a competitor robs LEX of the good will it has paid to establish. Id.

In addition, LEX's success is very much a result of the processes and methods it employs in servicing the needs of its customers. The section of Mole's contract that provides that "[b]y virtue of Employee's employment with the Company, Employee will become familiar with and have access to the manner, methods, trade secrets, and confidential information pertaining to the Company's business," is intended to protect that confidential information. Today's litigation environment not only requires methods and processes to reproduce and number massive quantities of paper documents, it also requires the service provider to be able to acquire and manage massive quantities of digital information, such as email. Everything today is converted and/or produced in digital format and stored in a web accessible environment. Each law firm has developed its own protocols and those protocols are often case specific. Thus, as one of LEX's more successful Sales Consultants, Mole developed detailed and specific knowledge regarding client needs, protocols, and the like, which give LEX an advantage in competing with other service providers for this business.

In addition, part of the service LEX provides is a post mortem as it completes each major project. In that post mortem, the issues that arose, which include issues within the law firm or corporate customer, are vetted and solutions proposed. This is a detailed, in depth, review of the client's processes, LEX's processes, and the jointly developed solutions to problems and suggestions for improvement. Becoming so intimately involved in the client's internal case handling procedures makes LEX almost indispensable to the client for future similar projects.

7

Mole acquired that confidential knowledge for both his own clients and the clients of other members of the LEX service team.

Mole has confirmed his intent to violate his non-compete, and to directly compete with LEX. As stated above, on April 2, 2007, Mole resigned. Very recently, LEX received information that Mole has been soliciting Howrey, LLP ("Howrey") personnel, a LEX customer, outside the Howrey building. Mole's Agreement expressly defines his activities with respect to Howrey as prohibited solicitation. Tomashefski Aff., Ex. 1.

On April 11, 2007, almost immediately after learning of Mole's potential employment at Driven, LEX, through counsel, specifically put Mole and Driven on notice of Mole's violation of his Employment Agreement. 4/11/07 Laws Letter, Ex. 5. Mole's counsel responded to that notice by letter dated April 13, 2007. In that correspondence, Mole took the position that his employment with Driven did not violate his Agreement, but refused to provide any detail or explain how it was that Mole's employment with Driven was not a business activity that competes with LEX. As stated above, Driven has never responded.

Although LEX cannot determine at this time the full extent of Mole's contact and solicitation of LEX's customers, LEX is, as stated above, aware that Mole has contacted LEX's customers in violation of his Employment Agreement. Tomashefski Aff., Ex. 1.

When he was hired by LEX, Mole acknowledged and admitted that the services he would perform for LEX were special, unique, and extraordinary. He further admitted that his services were of such a nature that violation of his non-compete agreement would constitute severe, irreparable injury. Notwithstanding these acknowledgements and his agreement, Mole, on behalf of Driven, has been actively soliciting LEX's customers in breach of his Employment Agreement. For its part, Driven has encouraged and induced Mole to breach his Employment

Agreement with LEX by making such prohibited contact with LEX's customers, knowing that such conduct breached his Employment Agreement with LEX. The activities of Mole and Driven resulted in the loss of LEX's business, customers, good will, and profits. Although more difficult to quantify, LEX has also incurred additional losses as the result of Mole and Driven, including the cost of hiring and training sales personnel, the cost of developing relationships between LEX employees and its customers, the cost of advertising and promotional activities, and related office and overhead expenses.

### III.    ARGUMENT

**A.    LEGAL STANDARDS.**

**1.    A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION IS WARRANTED IN THIS CASE.**

The decision to grant a temporary restraining order ("TRO") is a balancing test with the level of harm to the movant weighed against potential harm to the non-movant. Simpson v. Lee, 499 A.2d 889, 892 (D.C. 1985); Don't Tear It Down, Inc. v. District of Columbia, 395 A.2d 388, 390 (D.C. 1978).

LEX's Verified Complaint in support of its Motion demonstrates that if a TRO is not issued, immediate, substantial, and irreparable harm will result to Plaintiff before an adversary hearing can be had. Specifically, if Mole and Driven are not enjoined, LEX will be irreparably harmed by Mole and Driven's use and disclosure of LEX's trade secrets and confidential proprietary information in that Mole will use such information to compete with LEX at Driven, or Driven will use the information to compete with LEX.

It is indisputable that Mole had access to the confidential and trade secret information of LEX, and was contractually prohibited from soliciting LEX's customers and competing with

LEX after his termination of employment. There is a strong public interest served in protecting confidential business information and trade secrets. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz, 298 F. Supp. 2d 27, 34 (D. D.C. 2002); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Schultz, 2001 WL 1681973 at *4 (D. D.C. 2001); see also Eden Hannon & Co. v. Sumitomo Trust and Banking, 914 F.2d 556 (4th Cir. 1990); Comprehensive Techs. Int'l, Inc. v. Software Artisans, Inc., 3 F. 3d 730, 739 (4th Cir. 1993) (when an employee has access to confidential and trade secret information of the employer's business, the employer has a strong interest in protecting it because other legal remedies are inadequate).

LEX's Complaint demonstrates that LEX has already lost good will with its customers. An award of money damages cannot rebuild lost good will because there is no way to assess the full extent of lost customers' alienation or disaffection from it. Eden Hannon & Co. v. Sumitomo Trust & Banking, 914 F.2d 556, 560-61 (4th Cir. 1990); see also Comprehensive Techs. Int'l, Inc. v. Software Artisans, Inc., 3 F.3d 730, 739 (4th Cir. 1993).

Perhaps even important than the customer contacts Mole took with him is the confidential information he brings to Driven. As stated above, LEX has developed methods and processes to meet unique client needs, that it can and does tailor to meet specific situations. This knowledge is priceless, in that it cannot ever be quantified, but it gives Driven, through Mole, the unfair advantage of having that which took LEX years, and extraordinary expense, to develop. Even if Mole did not take with him actual paper or digital information taken from LEX, he takes with him the knowledge and experience that gives LEX its competitive advantage. That section of Mole's contract that prevents him from working for a competitor in the market area he served with LEX is intended to protect this interest.

The amount of future profits that will be lost as a result of the wrongful actions of Defendants, particularly the methods and processes to which Mole had access, is impossible to assess. Undeniably, Mole had access to, and is in possession of, confidential, proprietary, and trade secret information concerning LEX's customers, employees, and its business practices. Damage has occurred and will undoubtedly worsen unless Mole is enjoined. See Merrill Lynch, Pierce Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048, 1055 (4th Cir. 1985) (harmful actions must be enjoined immediately, because an injunction after just a few days cannot undo the damage – a customer cannot be "unsolicited").

The decision whether to grant or deny a motion for temporary restraining order or preliminary injunction is committed to the sound discretion of the trial judge. Applying the standards set forth above shows that LEX has met its burden and this Court should issue a temporary restraining order and, following an appropriate hearing, a preliminary injunction against each of the Defendants. Plaintiff's Motion for TRO should be granted.

## 2.   PRELIMINARY INJUNCTIVE RELIEF IS APPROPRIATE IN THIS CASE.

The standard for awarding preliminary injunctive relief is well-settled in this court. Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998); Morgan Stanley DW, Inc. v. Rothe, 150 F. Supp. 2d 67, 72 (D. D.C. 2001). Four factors must be considered:

(1)   there is a substantial likelihood plaintiff will succeed on the merits;

(2)   plaintiff will be irreparably injured if an injunction is not granted;

(3)   an injunction will not substantially injure the other party;

(4)   the public interest will be furthered by an injunction.

Mova Pharmaceutical, 140 F.3d at 1066. These four factors are not considered in isolation from one another, and one factor is not dispositive. CityFed Fin. Corp. v. Office of Thrift Supervision,

58 F.3d 738, 746 (D.C. Cir. 1995). Instead, the factors "interrelate on a sliding sale and must be balanced against each other." Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1991) (citing Serono Labs v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998)). An injunction may be justified even where the arguments on one or more of the factors are not as strong. CityFed Fin. Corp., 58 F.3d at 747. For example, where there is a strong likelihood of success on the merits, an injunction will lie, even if there is a slight showing of irreparable harm. Id.

The decision whether to grant or deny a motion for TRO is committed to the sound discretion of the trial judge. Armstrong v. Bush, 807 F. Supp. 816, 820 (D. D.C. 1992); Simpson, 499 A.2d at 892. Applying the standards set forth above shows that LEX has met its burden and this Court should issue a TRO and, following an appropriate hearing, a preliminary injunction against the Defendants.

### B.    LEX HAS SUFFERED AND WILL CONTINUE TO SUFFER IMMEDIATE AND IRREPARABLE HARM WITHOUT AN INJUNCTION.

The purpose of interim injunctive relief is to prevent irreparable harm so as to preserve the Court's ability to render a meaningful decision on the merits. Federal Leasing, Inc. v. Underwriters at Lloyd's, 650 F.2d 495, 499 (4th Cir. 1981). LEX has already suffered irreparable harm and will continue to suffer irreparable harm to the conduct of the business if Driven and Mole are permitted to continue to use confidential business information belonging to LEX. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz, 298 F. Supp. 2d 27, 34 (D. D.C. 2002). This represents a classic case where money damages will not constitute an adequate remedy since it is impossible to calculate the amount of damage LEX will suffer if Driven and Mole

continue to use and disclose its confidential and proprietary business information. Rothe, 150 F. Supp. 2d at 78.

First, Mole, in his Employment Agreement, contractually admits and concedes that a breach of the non-disclosure and non-competition clauses of his agreement would constitute irreparable injury. Indeed, the irreparable nature of the harm is so readily apparent that Mole contractually consents to the entry of an injunction without need to satisfy this element of a motion for an injunction. To quote the contract:

> In the event of a breach of any provision of Section 10 by Employee, Employee agrees that the Company shall be entitled to an injunction prohibiting conduct in breach of this Agreement. Employee acknowledges and agrees that a breach of Section 10 will result in immediate, actual, irreparable injury to the Company. Employee further acknowledges and agrees that it is impossible to determine with any reasonable accuracy the financial injury that could and/or would result by actions in breach of Section 10.

Employment Agreement, Ex. 4. Such a provision operates as a contractually enforceable right and an admission.

In any event, it is clear from both the facts and the law that LEX has been irreparably harmed and continues to be irreparably harmed by Mole's solicitation of LEX's customers. Courts regularly presume irreparable harm where a former employee possesses confidential information and then leaves and provides that information to a competitor. Wertz, 298 F. Supp. 2d at 34; see also Lumex, Inc. v. Highsmith, 919 F. Supp. 624, 628 (E.D.N.Y. 1996) (irreparable harm found where the threat of inadvertent disclosure of trade secrets and confidential information and former employee uses confidential information and trade secrets in his new job).

As did the courts in Rothe and Wertz, courts routinely grant preliminary injunctions where a former employee breaches a restrictive covenant. See Vencor, Inc. v. Webb, 33 F.3d 840, 845-46 (7th Cir. 1994); JAK Prod., Inc. v. Wiza, 986 F.2d 1080, 1084-86 (7th Cir. 1993);

13

Basicomputer Corp. v. Scott, 973 F.2d 507, 511-13 (6th Cir. 1992); Ferrero v. Associated

Materials, Inc., 923 F.2d 1441, 1449 (11th Cir. 1991); Bradley, 756 F.2d at 1055; Merck & Co.,

Inc. v. Lyon, 941 F. Supp. 1443, 1458 (M.D. N.C. 1996); Merrill Lynch, Pierce, Fenner & Smith

v. Hagerty, 808 F. Supp. 1555, 1559 (S.D. Fla. 1992), aff'd, 2 F.3d 405 (11th Cir. 1993); Chem-

Trend Inc. v. McCarthy, 780 F. Supp. 458, 460-63 (E.D. Mich. 1991); Picker Int'l, Inc. v.

Blanton, 756 F. Supp. 971 (N.D. Tex. 1990); Hekiman Lab., Inc. v. Domain Sys. Inc., 664 F.

Supp. 493, 498-99 (S.D. Fla. 1987); Quantum Health Res. v. Hemophilia Res. of Am., Inc., 1995

U.S. Dist. LEXIS 16726, at *50-51 (M.D. N.C. 1995); Kinder-Care, Inc. v. Holland, 1989 U.S.

Dist. LEXIS 18063, at *4-13 (E.D. Va. 1989).

The cases finding irreparable injury flowing from lost good will are legion. See, e.g.,

Tom Doherty Assocs., Inc. v. Salvan Enter., Inc., 60 F.3d 27, 37 (2d Cir. 1995) (recognizing that

threatened loss of good will and customers constitutes irreparable injury for purposes of granting

a preliminary injunction); Gateway E. Ry. v. Terminal R.R. Ass'n of St. Louis, 35 F.3d 1134,

1140 (7th Cir. 1994) (affirming the holding that loss of good will satisfied the irreparable injury

prong necessary for a preliminary injunction and specifically noting that damages are inadequate

to compensate for such a loss); Basicomputer Corp. v. Scott, 973 F.2d 507, 511-12 (6th Cir.

1992) (holding that loss of customer good will and competitive standing in the relevant market

constitutes irreparable injury entitling a plaintiff to a preliminary injunction in a suit to preclude

former employees from using confidential information); Rent-A-Center, Inc. v. Canyon

Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991) (ruling that injury to good

will and recruitment efforts qualify as irreparable harm); Multi-Channel TV Cable Co. v.

Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994) (possibility of

permanent loss of customers to a competitor or loss of good will creates irreparable harm); Eden

Hammon, 914 F.2d at 560-61 (holding that award of money damages cannot rebuild lost good will because there is no way to assess full extent of lost customer's alienation or disaffection from it); Merrill Lynch, Pierce Fenner & Smith, Inc. v. Bradley, 756 2d 1048, 1054 (4th Cir. 1985) (finding irreparable injury because customers cannot be "unsolicited").

LEX has a legally protectable interest in its trade secrets and confidential business information. Schultz, 2001 WL 1691973 at *3 ("[A]n injunction is important in promoting the public interest because its protects the confidentiality of company trade secrets."). LEX has expended substantial effort and cost to develop its confidential and proprietary business information and is entitled to protect itself from the risk that a former employee might take unfair advantage of information and knowledge he obtained while working for LEX. Id. LEX has protected itself through the restrictive covenants contained in Mole's Employment Agreement. Despite these restrictive covenants, however, Mole has blatantly breached his obligations by working for a LEX competitor, and soliciting at least one LEX customer. LEX is losing business and will continue to lose its competitive advantage in the marketplace through Mole's improper actions. As LEX has lost and will continue to lose business and its competitive advantage through disclosure of its confidential and proprietary information, injunctive relief should be granted.

C.   **THERE IS SUBSTANTIAL LIKELIHOOD THAT LEX WILL PREVAIL ON THE MERITS.**

1.   **MOLE BREACHED HIS CONTRACTUAL OBLIGATIONS.**

Mole's Employment Agreement is governed by Maryland law. Maryland law has long recognized that an employer has a protectable interest in the good will of its business and its customer relationships. Ruhl v. F. A. Bartlett Tree Expert Co., 245 Md. 118, 127, 225 A.2d 288, 293 (1967); Intelus Corp. v. Barton, 7 F. Supp. 2d 635, 643 (D. Md. 1998). Restrictive

covenants are "important to our economic system as well as to employers that proprietary interests of business be properly protected." Ruhl, 245 Md. at 127, 225 A.2d at 293. Maryland courts routinely enforce non-competition covenants where the former employee created good will of customers and clients. Millward v. Gerstung Intern. Sport Educ., Inc., 268 Md. 483, 489, 302 A.2d 14, 17 (1973); Fowler v. Printers, II, 89 Md. App. 448, 465, 598 A.2d 794, 802 (1991).

As to duration, the covenants are reasonable in time and limited to only two years. Maryland courts have routinely upheld covenants that are for two years, and have expressly held that a two year time period is reasonable and enforceable. See, e.g., Gill v. Computer Equip., 266 Md. 170, 180, 292 A.2d 54 (1972) (two year duration upheld); Tuttle v. Riggs-Warfield-Roloson, 251 Md. 45, 246 A.2d 588 (1968) (two year duration upheld); Ruhl, 245 Md. at 127, 225 A.2d at 293 (two year duration upheld).

Further, the covenants are reasonable in terms of the type of employment. The covenants only extend to protect the nature and extent of the primary business purposes of LEX. Indeed, LEX is not limiting Mole's ability to earn a living; it simply restricts Mole's ability to compete in the same or similar business of LEX. Tabs Assocs. Inc. v. Brohawn, 59 Md. App. 330, 338-39, 475 A.2d 1203, 1208 (1984) (no hardship on former employee to enforce covenant where employee could use his skills in any other business).

Further, the District of Columbia has long recognized that an employer has a protectable interest in "trade secrets, confidential knowledge, expert training or fruits of employment." Saul v. Thalis, 156 F. Supp. 408, 412 (D. D.C. 1957). In addition, employers in the District of Columbia have protectable interests in customers, and customer lists. Rothe, 150 F. Supp. 2d at 78; Ellis v. James Hurson Assoc., 565 A.2d 615, 620 (D.C. App. 1989). The courts in this and virtually every other jurisdiction recognize the need to protect business interests through a non-

compete to prevent a former employee's disclosure of confidential and proprietary business information.  See, e.g., Vencor, 33 F.3d at 845-46; Wiza, 986 F.2d  at 1084-86; Basicomputer Corp., 973 F.2d at 511-13; Ferrero, 923 F.2d at 1449; Merck & Co., Inc., 941 F. Supp. at 1458; Hagerty, 808 F. Supp. at 1559 , aff'd, 2 F.3d 405 (11th Cir. 1993); Chem-Trend Inc., 780 F. Supp. at 460-63; Hekiman Lab., Inc., 664 F. Supp. at 498-99.  Besides having protectable interests in the confidential customer lists and LEX's good will of its business, LEX has a protectable interest in Mole's services as they are special, unique, and extraordinary.

In addition, under D.C. law, Mole's Employment Agreement with LEX is reasonable with respect to both geographic scope and duration.  Mole's agreement prohibits him from competing activity within the Metropolitan D.C. Area, defined as the District of Columbia and the contiguous Maryland and Virginia counties.  The scope of Mole's Employment Agreement is clearly reasonable, in light of the decisions of the courts in this jurisdiction.  See Ellis, 565 A.2d at 620 (three year covenant not to compete held reasonable); Nat'l Chemsearch Corp. of N.Y. v. Hanker, 309 F. Supp. 1278 (D. D.C. 1970) (one year covenant not to compete in former employee's territory that included the District of Columbia and twelve Virginia counties held reasonable);  Meyer v. Wineburgh, 110 F. Supp. 957 (D. D.C. 1953) (five year covenant against former employee of pest control company reasonable); Chemical Fireproofing Corp. v. Krouse, 155 F.2d 422 (D.C. Cir. 1946) (one year covenant not to compete covering six states reasonable, where the job was unskilled labor involving no trade secrets); Erikson v. Hawley, 56 App. D.C. 268, 12 F.2d 491 (1926) (ten year covenant not to compete in District of Columbia upheld).

Finally, the public interest favors the enforcement of restrictive covenants so that employers can share confidential information with employees without fear that such information

will be unfairly disseminated to competitors.  See Merck & Co., Inc. v. Lyon, 941 F. Supp. 1443,

1462 (M.D. N.C. 1996).

### 2.    MOLE MISAPPROPRIATED TRADE SECRETS UNDER THE UNIFORM TRADE SECRETS ACT.

Besides breaching his contractual obligations to LEX, Mole has wrongfully

misappropriated LEX's proprietary, confidential information and trade secrets in violation of the

Maryland Uniform Trade Secrets Act (the "Trade Secrets Act"), Md. Code Ann. Commercial

Law, §§ 11-1201, et. seq.  In pertinent part, Section 11-1201(c) of the Trade Secrets Act

provides:

> Misappropriation means the . . . disclosure or use of
> a trade secret of another without express or implied
> consent by a person who. . . at the time of the
> disclosure or use, knew or had reason to know that
> the knowledge of the trade secret was: (1) derived
> from or through a person who had utilized improper
> means to acquire it; (2) acquired under
> circumstances giving rise to a duty to maintain its
> secrecy or limit its use; or (3) derived from or
> through a person who owed a duty to the person
> seeking to maintain its secrecy or limit its use. . . .

Id.; see also Diamond v. T. Rowe Price Assocs., 852 F. Supp. 372 (D. Md. 1994).  Mole

certainly had reason to know that he acquired LEX's trade secrets under circumstances giving

rise to a duty to maintain its secrecy and as an LEX employee in a competitive environment,

owed a duty to LEX to maintain its secrecy.  Indeed, under the Trade Secrets Act, a trade secret

includes:

> . . . information, including a formula, pattern,
> compilation, program, device, method, technique or
> process, that:
>
> 1. Derives independent economic value, actual or
> potential, from not being generally known to, and
> not being readily ascertainable by proper means by,

other persons who can obtain economic value from
its disclosure or use; and

2. Is the subject of efforts that are reasonable under
the circumstances to maintain its secrecy.

Id. at § 11-1201 (e).

The Trade Secrets Act further provides that "actual or threatened misappropriation [of a trade secret] may be enjoined." Id. at § 11-1202 (a). Specifically, a party may initiate an action even before damages (or irreparable harm) actually accrue. Optic Graphics, Inc. v. Agee, 87 Md. App. 770, 793, 591 A.2d 578, 589 (1991). The reasoning behind this immediate relief is that the actual or threatened misappropriation of the trade secret outweighs any harm that may occur to the Defendants in the event that an injunction is granted.

On these facts, LEX's ability to succeed on the misappropriation of trade secrets count of its Complaint is clear. The information at issue clearly qualifies as a trade secret and the information was misappropriated within the meaning of the law. See, e.g., Space Aero Prods. Co. v. R. E. Darling Co., 238 Md. 93, 105, 208 A.2d 74, 79 (1965).

Even if Mole and Driven were somehow found to have not violated the Trade Secrets Act, the common law equally restrains them from expropriating confidential, proprietary information. Thus, the usual rule that a former employee, after termination of employment, may compete with a former employer, is subject to the limitation that the employee not use confidential, proprietary information obtained from the former employer, or in other words, gain competitive advantage by taking what rightfully belongs to the former employer. See Community Counseling Services, Inc. v. Reilly, 317 F.2d 239, 244 (4th Cir. 1963); see also Eden Hannon, 914 F.2d at 560-61. In this case, Mole has misappropriated LEX's information under a common law analysis as well.

**D. THE BALANCE OF HARDSHIPS OVERWHELMINGLY TIPS IN FAVOR OF LEX AS LEX WILL SUFFER MORE HARM FROM THE DENIAL OF THE INJUNCTION THAN WILL RESULT TO THE DEFENDANTS FROM ITS GRANT.**

The injunction sought by LEX is narrow in its scope, and simply orders Mole to do that which he was already legally obligated to do. As a matter of law, there can be no harm to the Defendants in an injunction that requires Mole to honor the terms of his Employment Agreement and enjoins Driven from interfering with this contractual relationship. See Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 362-63 (4th Cir. 1991) (no harm to defendants from requiring compliance with existing law); Uncle B's Bakery Inc. v. O'Rourke, 920 F. Supp. 1405, 1434-37 (N.D. Iowa 1996) (no harm in enjoining former employee from doing what he is contractually prevented from doing). Indeed, Mole will not suffer any harm if he is not in fact soliciting customers of LEX that he promised not to solicit. Quantum Health, 1995 U.S. Dist. LEXIS 16726, at *50-51.

Moreover, the injunction that LEX seeks is narrowly tailored to prevent Mole from contacting and soliciting customers of LEX, and from competing in the sales territory for which he was responsible, for a period of two years after termination of employment. It would not prevent Mole from engaging in the reprographics, litigation support, or commercial printing business outside this specified area. Indeed, according to Driven's web site, it does business in 30 cities in 20 states. Maryland courts have consistently upheld similar geographic restrictions and held that such geographic restrictions are reasonable. Ruhl, 245 Md. at 127, 225 A.2d at 293; Millward, 268 Md. at 489, 302 A.2d at 17; Tabs Assocs. Inc. v. Brohawn, 59 Md. App. 330, 338-39, 475 A.2d 1203, 1208 (1984).

As for Driven, the injunction will not prevent them from competing with LEX in the specified area, nor will it prevent Driven from contacting and soliciting LEX's customers,

provided that Mole is not involved in the solicitation. The injunction sought here will have a minimal effect on the Defendants, particularly compared to the significant harm that Mole's breaches and Driven's tortious conduct have caused and will cause LEX.

### E. INJUNCTIVE RELIEF IS WARRANTED WITH RESPECT TO DRIVEN.

Injunctive relief is warranted against Driven. Driven has interfered and is tortiously interfering with the contract between LEX and its former employee, Mole.

To establish a claim for tortious interference with contractual relations, a plaintiff must show: (1) the existence of a valid contract between the plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional procurement of a breach of the contract by the third party; and (4) damages caused by the breach. Computer Data Sys., Inc. v. Automated Bus. Sys. & Servs., Inc., 1992 WL 135928 at *9 (D. D.C. 1992); Casco Marina Dev., LLC v. District of Columbia Redevelopment Land Agency, 834 A.2d 77, 83 (D.C. 2003). See also Fraidin v. Weitzman, 93 Md. App. 168, 189, 611 A.2d 1046, 1057 (1992).

In this case, there is a valid Employment Agreement between LEX and Mole that contains non-compete and non-solicitation covenants. Knowing that restrictive covenants are common in the reprographics, litigation support, and commercial printing industry, Driven had reason to know that Mole was bound by such a restrictive covenant -- at the very least, Driven should have inquired into the existence of such an agreement. By the time Driven entered into an agreement with Mole, it unquestionably knew about Mole's agreement and acted in knowing derogation thereof.

Even if Driven did not know of the existence of Mole's Employment Agreement at the time it entered into an employment arrangement with Mole, it certainly had knowledge of the Employment Agreement when counsel for LEX forwarded a copy of the agreement to Driven .

21

With the knowledge of the restrictive covenants contained in Mole's Employment Agreement, Driven aided, encouraged, and induced Mole to continue to breach his obligations to LEX under the Employment Agreement. It is undeniable that Mole's improper activities were committed for the benefit of Driven. As a result of Driven's tortious interference, LEX has suffered substantial financial injury in terms of lost customers and lost good will.

The granting of preliminary injunctive relief against Driven is justified for the same reasons as against Mole. The fact that Driven had both actual and constructive notice of Mole's Employment Agreement, and yet continued to aid, encourage, and induce Mole to breach his agreement shows that LEX would likely succeed on the merits. LEX has suffered and will suffer irreparable harm through the loss of customers and good will if Driven is not enjoined. Conversely, there is no harm to Driven in enjoining Driven from interfering with Mole's valid contract and taking unfair advantage of the business relationships developed at great cost and expense by LEX. Indeed, the requested injunction would not prevent Driven from competing against LEX or from contacting all of LEX's customers. The injunction would simply prohibit such contact and competition from the efforts of Mole.

## F.    THE PUBLIC INTEREST FAVORS ENFORCING MOLE'S CONTRACTUAL OBLIGATIONS.

The public interest favors the enforcement of contracts that are freely entered into and not unreasonable. Intelus Corp., 7 F. Supp. 2d at 642 (explaining that the public has an interest in enforcement of reasonable restrictive covenants). The covenants contained in Mole's Employment Agreement are reasonable in that they are limited in time and narrow in scope and geographic area. Moreover, the public interest favors the enforcement of restrictive covenants so that employers can share confidential information with employees without fear that such information will be unfairly disseminated to competitors. Id.; Merck Co. v. Lyon, 941 F. Supp.

1443, 1462 (M.D. N.C. 1996). Finally, the public interest is best served by enjoining Mole from using improper tactics to gain a competitive advantage. In sum, the public interest favors enforcement of the covenants in this case.

## IV.    **CONCLUSION**

For all the foregoing reasons, LEX, Inc. t/a LEX On Demand respectfully requests that the Court grant its Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

Francis R. Laws (MD Bar No. 2596)
Sara A. Levinson (MD Bar No. 26082)
THOMAS & LIBOWITZ, P.A.
100 Light Street, Suite 1100
Baltimore, MD 21202-1053
(410) 752-2468
Fax: (410) 752-0979

Attorneys for Plaintiff
LEX, Inc. t/a LEX On Demand

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LEX, INC. t/a LEX ON DEMAND** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CIVIL ACTION NO.** |
| **DRIVEN, INC., et al.** | * | |
| **Defendants** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## AFFIDAVIT OF DAVID TOMASHEFSKI

1.     I am a witness of lawful age, competent to testify to the matters related herein. The following is based on personal knowledge.

2.     I am the President of LEX, Inc. t/a LEX On Demand ("LEX").

3.     Stephen Mole began working for LEX on or about September 25, 2003 as a Sales Consultant in the Washington D.C. office and executed an Employment Agreement that contained the terms and conditions of his employment.  Mole's duties as a Sales Consultant included sales to existing and prospective customers, marketing, advertising, and promotional efforts, estimating and bidding of jobs, and resolving customer complaints.  Mole's sales territory included all of Washington D.C., Arlington, Fairfax, Loudon, and Prince William Counties and the City of Alexandria, Virginia, and Montgomery, Prince George's, Howard, and Charles Counties, Maryland, with a primary focus on Washington, D.C.

4.     During his employment with LEX, Mole had daily contact with the Company's customers. As part of his duties and responsibilities, Mole was expected to, and did, develop personal relationships with persons who had purchasing responsibilities within the law firms that formed his customer base.

5.      LEX and Defendant Driven, Inc. are competitors engaged in, among other things, duplicating, litigation support, print on demand, and eDiscovery services. Both companies market their services to the same customers, to assist firms and corporate entities in meeting their photocopy and electronic discovery needs. The business itself is highly competitive and most companies seek to protect themselves from employees leaving to go with a competitor by non-compete agreements.

6.      Law firms typically have wide latitude in deciding which company to use for their photocopy and eDiscovery needs. Developing and maintaining personal relationships with the lawyers, paralegals, and support staff who make the decision which law firm to use is critical. To initiate and foster these personal relationships, LEX encourages its Sales Consultants to spend time with the critical contact people, to invite them to happy hours sponsored by LEX and occasionally to sporting events. LEX's Sales Consultants are also encouraged to distribute small gifts to customers and prospective customers which are purchased by LEX.

7.      When Sales Consultants are hired by LEX, they are assigned specific law firms and other customers to serve and market. The Sales Manager and/or Managing Partner of the office conducts regular meetings with the Sales Consultants. At these meetings, the Sales Consultants share information with respect to contacts within law firms, thoughts on how to approach and solicit new or more business, and big cases that may have been picked up by the law firms. In addition, the Sales Consultants cover for one another in serving their firms, and they rotate "on call" duties on evenings and weekends, covering one another's firms during the off hours. The identities of individuals within firms who make the decisions with respect to which copy service provider to use, or who will provide information as to the source of that information and whether the firm has recently gotten a big case with heavy copy work demands, is extremely confidential, highly privileged information.

2

8.    Mole's contributions to LEX were unique, special, and extraordinary.  His own customer list included some of this office's biggest clients.  To develop that business, Mole developed personal relationships with lawyers, paralegals, and secretaries within law firms through direct solicitation, gifts, and engaging in social activities with such individuals.  Like most Sales Consultants, Mole's success was a function of the information provided by LEX and its employees, coupled with his own abilities to initiate and foster those personal relationships.

9.    On Mole's last day of employment with LEX, I reiterated to Mole that he had a non-compete, in which he was prohibited from soliciting LEX customers to which he had contact and to compete with LEX.  When I asked Mole to assist us in introducing the new Sales Consultant that would take over his territory to Mole's former customers, Mole refused to comply.  Mole advised me that it would not be in his best interest to introduce the new Sales Consultant to his former customers, which indicates his intention to compete.  This intention has been confirmed by reports that Mole has been soliciting Howrey, LLP ("Howrey") personnel, a LEX customer, outside the Howrey building.  Mole's Agreement expressly defines his activities with respect to Howrey as prohibited solicitation.

10.    It is my understanding that since leaving LEX, Mole has become employed by a competitor, Driven, Inc.  Based upon my many years of experience in the industry, Mole's defection to a competitor, coupled with his refusal to assist in introducing his successor to his clients, leads me to suspect that Mole is going to directly or indirectly compete with LEX, in violation of his Employment Agreement. LEX incurred significant costs and expenses in developing its customer base in Washington, D.C. These costs included, among other things, the cost of hiring and training employees (including Mole), the cost of developing the relationships between LEX employees and the customers, the cost of advertising and promotional activities, and related office and overhead expenses.

3

In accordance with 28 USC § 1746 I declare under penalty of perjury that the foregoing is true and correct.

Apr 17, 2007
DATE

DAVID TOMASHEFSKI



**LITIGATION SUPPORT**
**AND**
**ELECTRONIC DATA DISCOVERY**

**GRAPHICS**
**AND**
**ON-DEMAND DIGITAL COLOR PRINTING**



Driven Inc. specializes in all aspects of litigation support
including Digital Reproduction, Blowback, Scanning, Conversion, Graphic Design and Printing, and Electronic Data Discovery.
Virginia Office:Driven, Inc.
6521 Arlington Blvd. Suite 312Falls Church, VA 22042
Washington D.C. Office:Driven, Inc.
1275 K ST N.W. G6 Washington, DC 20005
Toll Free: 1.877.637.4836
Virginia Office: 703.533.9200 : Washington D.C. Office: 202.289.8111

**SUBMIT PAYMENT**





**Driven Inc. specializes in all aspects of litigation support including Digital Reproduction, Blowback, Scanning, Conversion, Graphic Design and Printing, and Electronic Data Discovery.**

Based in the Washington, D.C. area, Driven has provided support to clients across the country and typically handles information and data on hundreds of legal matters every month totalling millions of pages.

Trust your data and your case to the leader in litigation support.
**Driven**

GRAPHICS SERVICES







GRAPHICS SERVICES

## CONVERSION »

Driven is one of the industry leaders in electronic data conversion. Our experienced team of data experts and state of the art processing facility are unmatched in the legal industry. With in-house programmers and seasoned data analysts, we have the knowledge and horsepower to handle your most challenging legal conversion projects.

## EMAIL FORMATS

### LOTUS NOTES NSF

Driven's proprietary Notes program allows us to convert NSF files in their native format rather than shifting the data to Outlook PST's. This feature assures the integrity of the document creating fewer authentication problems later in the case. Our process converts not only the email messages, but the calendar entries and contacts as well.

*"Few vendors have shown more than a passing familiarity with Lotus Notes -- which is the e-mail system of choice for some of our largest clients. Driven could not only manage its digital discovery process against a Lotus Notes mailbox, but also produced an accurate Introspect IDX load file. The output Driven provided deserves special note, as it matched exactly the requirements set forth by agreement between the parties in our largest matter involving Lotus Notes data -- e-mails messages printed to TIFF, with all embedded graphics intact, and all attachments in their native format."*

National Law Firm

### MICROSOFT OUTLOOK PST

Driven takes a comprehensive approach to capturing all data involved in email attachments. We are able to preserve the link between the email messages and their associated attachments. Our custom built conversion software goes far beyond the industry standard plug and play programs.

### OTHER FORMATS

As an industry leader, Driven has been asked to work on some of the most challenging cases. Our exposure to projects involving uncommon email platforms such as Groupwise and RFC822 has made Driven the single source for all of your conversion projects.

## NATIVE FILE FORMATS

### MICROSOFT EXCEL

One of Driven's major competitive advantages is our custom Microsoft Excel prep software. We have automated such tasks as removal of blank pages, removal of auto-dates, and other tedious advanced re-formatting options.

### UNCOMMON FILE FORMATS

Driven's data consultants are experts in converting those little known applications and file formats. Our software experts are able to write conversion programs on demand for over 250 file formats. Where our competitors off-the-shelf programs fall short, Driven is able to complete the job no matter what the challenge.





**GRAPHICS SERVICES**

## ELECTRONIC DATA DISCOVERY »

**Driven is a major provider of document discovery, production, and other litigation support services. With custom applications for searching, de-duping, and data conversion, we have revolutionized the way the legal industry deals with the electronic discovery of data. Driven's ability to save you time and money can dramatically increase your success in litigation.**

### DRIVEN'S SOLUTION

Driven recognizes that the requirements for each case are unique. By providing both consultation and quality control, we are able to ensure an efficient and accurate product in every phase of the production process. Driven's process consists of the following steps:

- Data provided by client or harvested by Driven's experts
- Data restoration
- Analyze data
- Extract only specified, tiered information to high-speed media
- Reduction of data size (D-dupe, D-Search, D-Code)
- Excel preparation (if needed)
- Conversion to specified format
- Load file preparation (Including custom files if needed)
- Production (Electronic or paper)

### D-DUPING

As a leader in Electronic Data Discovery, Driven is at the forefront of advancing de-duplication technology. Our mastery of the Lotus Notes and Outlook platforms has led us to develop the capability to de-duplicate across NST, PST, and native files simultaneously. This can done by custodian or across the entire data universe on a rolling basis.

### D-SEARCH

Driven's custom searching capability allows you to review only the data that is most relevant. Our experts are able to use some of the most advanced search tools available to provide accurate and efficient queries.

### ONLINE REVIEW

Web hosting if needed, with secure online review capabilities.

**The capability to de-dupe and search effectively can save you an incredible amount of time and resources. Your document reviews will be more consistent and accurate by avoiding multiple reviews of the same document.**

### ADDITIONAL SERVICES:

- Custom Load Files
- Data Consulting
- Endorsement/Branding of Images
- Data Hosting
- Data Restoration



# DIGITAL SERVICES

### DIGITAL SERVICES »

## BLOWBACK

**Driven has the capability to print over 200 file types and extensions. The most common files include:**

- Image Files (.tif, .jpg, .gif)
- Text Files (.txt, .rtf)
- Web Pages (.html, .xml, .php)
- Word (.doc)
- Excel (.xls)
- Power Point (.ppt)
- Access (.mdb)
- Outlook (.pst, .msg, .vcf)
- Adobe Acrobat (.pdf)
- Word Perfect (.wpd)
- Lotus Notes (.nsf)
- Zipped Files (.zip, .ace, .tar, .sit, .rar)

## DIGITAL SERVICES

**Driven has the capability to electronically brand and watermark tif, pdf and jpeg's with no character or location limitations.**

## SCANNING

### SCANNING PLATFORMS

- Ipro
- LAW
- Doculex
- Ribstone

## EXPORT FORMATS AND FILE TYPES

- Single/Multi Page TIF
- Single/Multi Page PDF
- CaseMap
- Concordance
- Delimited Text
- Doculex
- dtSearch
- Indata Trialdirector
- Inmagic's DB/Textworks
- Introspect eCM
- Ipro
- JFS Litigators Notebook
- LaserFiche
- OmniDocs
- Ringtail
- Sanction
- Summation Blaze
- TotalVz
- Storm
- Lextranet
- Custom Load Files

## DOCUMENT CODING WITH OMR – (Optical Mark Recognition)

- Custom OMR form design
- Forms may contain fields that are single, multiple, list and/or boolean values.
- OMR Forms are bar-coded with unique control numbers for document/database management
- Hand written notes can be added to the OMR forms







## LEGAL AND TECHNICAL CONSULTING »

**As an extended service, Driven provides its clients with both technical consulting and project management.**

### TECHNICAL CONSULTING

Our in-house technology experts are directly available to answer any questions or concerns about the best practices on how a project is or should be produced.

Driven has technicians available for on-site visits.

Driven's technicians are experts in the identification, retrieval, and conversion of electronic media.

Our technology expertise allows us to customize solutions for our clients while keeping the integrity of the data.

### PROJECT MANAGEMENT

Driven's staff specializes in litigation support to help our clients find the most efficient solution to their problem.

Project Managers assigned to client projects will closely manage and update job progress.

Driven's Project Managers will allow for clear project communication, precise project instructions and meticulous quality control.

Our extensive training program assures our clients that our project managers can efficiently handle even our most technically demanding projects with deadline compliance.

Litigation and technology will forever be intertwined. It is the goal of Driven to stay at the crest of this realism in order to best support our clients.

GRAPHICS SERVICES







GRAPHICS SERVICES

## COPYING SERVICES

- Legal Copying
- High Speed Duplicating
- Binder & Book Reproduction
- Color Copying
- Color and Black & White Large Format Production
- Customized Projects
- Black & White - Heavy Litigation to Straight Run
- Color - Full Color on a Variety of Stocks
- Long Run - Custom Binders, Books, Custom Tabs

## CUSTOM PRODUCTION AND ASSEMBLY

- Hand Insertions
- Custom Tab Production and Lamination

*Driven's unique capabilities allows us to offer these additional services in creating an end to end solution. We use the latest in digital printing technology including the following hardware; Xerox Docucolor 6060 and Docucolor 2045 with Creo Rips, 60" HP DesignJet 5000PS Oversize UV Printer, Seal Image 600-S Lamination and Mounting System, Xerox Wide-Format Scanner, Toshiba 310c Color Copier, Toshiba 810 Black & White Copier, and nearly 20 Cannon Image Runners.*

## LABELING

- Bates Labeling - Black and White or Color

## BINDERY SERVICES

Driven offers an experienced team charged with creating professional and effective bindery type products.

- GBC
- Wire O
- Tape
- Plasticoil
- Velo
- Saddle-Stitching
- Perfect Binding
- ACCO

## MEDIA DUPLICATIONS

We are able to duplicate and convert to many media types and various file types on the media.

- Audio
- Video
- CD
- DVD
- Hard Drives

## DOCUMENT DESTRUCTION

- Certified or Uncertified



**GRAPHICS SERVICES**

**ADDITIONAL SUPPORT »**

## DRIVEN DEVELOPS LOTUS NOTES BATCH PRINTING

### SCENARIO:

A client was having a hard time producing Lotus Notes email databases to paper with their current vendors. The client needed a more efficient process for their review of the lotus notes emails, so they gave Driven the challenge of accelerating the process for this production while keeping the integrity of the original emails in their native format.

### SOLUTION:

Printing of Lotus Notes email had been notoriously difficult for vendors throughout the DC Metro area. The only way vendors could expedite the process was by either manual printing or converting to outlook and printing in outlook format.

Our software developers looked into developing an automated printing program that would work inside of Lotus Notes, thereby keeping the native format. The program was developed in two weeks and went through another week of testing before we provided our client with this time saving solution.

The Automated Lotus Notes Batch Printing software Driven developed helped the client tremendously in their review of hundreds of thousands of emails and attachments printed with our software.

## ELECTRONIC CONVERSION

### SCENARIO:

A document management company was faced with a large electronic review production in a short amount of time. Their client sent them 19 cd's containing many different formats. Over 95% of the documents in the 19

## DRIVEN HANDLES LARGE 2ND REQUEST

### SCENARIO:

A small firm had received a rather large second request, requiring a very quick turnaround in production. They were given 24 outlook email databases (.pst's) and 100 boxes of heavy litigation to review and produce to the DOJ in a matter of weeks. Since the outlook databases had not yet been reviewed they needed a quick way to review them without the expense of using multiple computers and contract attorneys to sift through the databases electronically. Another main concern was the attorneys wanted to build an extensive index without manually typing in the relevant information for each document in the production.

### SOLUTION:

Because time and resource constraints were the main issues with this project Driven decided to blowback all outlook databases for quick review as well as develop a mark detect form that could be filled out by the attorney or paralegal and placed in front of every document so as to build the index when the document gets scanned.

In three days Driven printed 352,888 pages of outlook email with slipsheets for the attorneys to begin their review process. At the same time the scanning process began with the 100 boxes of litigation that had already been reviewed along with the mark detect coding sheet inserted with every document.

In four weeks Driven had scanned in 316,937 pages. The original deadline to produce the scanned documents to paper was suddenly reduced to a matter of days. Our team stepped up to the challenge and in three days 90% of the scanned material was endorsed, printed and submitted along with a customized electronic index. In the following days the last 10% was completed and submitted.

cd's were Microsoft Excel spreadsheets. The client needed all files converted to a uniform format(.tif) for loading into a Concordance database, thereby letting the contract attorneys review them online. They also needed certain metadata fields extracted from each document and cross-referenced with that document when loaded into Concordance.

**SOLUTION:**

The deadline for this production was short and the attorneys needed to review documents right away.

Our digital production team along with the project manager for the client devised a workflow program to get documents to the attorney's on a daily basis till the entire production was completed.

Since 95% of the production revolved around converting excel documents to TIFF, we were faced with developing a standard way of formatting each excel document so it could be converted correctly; hidden columns needed to be unhidden, text needed to be at a legible viewing level, headers and footers needed to be removed, auto date features needed to be turned off, and many other meticulous formatting issues that go along with converting spreadsheets.

Driven's software developers constructed a program that automatically set each excel file to the predetermined format agreed upon by the client. After formatting each file the conversion process could be begin.

Using the preset process developed by Driven, the client was able to keep the attorneys busy reviewing documents on a daily basis and the project was completed in under two weeks with almost 800,000 images reviewed.

A week after the project was completed the firm needed to have a second set printed and sent to Boston, MA. Because the documents were scanned and endorsed, Driven's team quickly printed every document and sent the 200 plus boxes with an attorney to Boston, MA in a matter of days

## BLOWBACK SOLUTION

**SCENARIO:**

An AMLAW top 20 law firm needed a vendor that could blowback thousands of endorsed documents directly from their online repository located in Boston, MA. on a weekly basis.

**SOLUTION:**

Driven coordinated with the repository vendor of the law firm to set up a secure download site for Driven. Our digital production team then used our automated printing software to quickly produce the needed documents to the law firm in a matter of hours.

By downloading the images directly from the repositories secure server we saved the client an entire day in delivery time. Since Driven has the capability to print close to 1,000,000 pages a day it made delivering the paper that much faster for the client to review the documents.



**Driven is dedicated to provided our clients with a consultative service approach. This method results in an educated client with an efficient, on point collation.**

- Hours of operation: 24 hours / 7 days a week.
- Presence in the legal communities of over 30 cities and 20 states
- Growing customer base including more than 260 corporate clients and law firms.
- Electronic Data Discovery facilities are Federal Government certified.
- Internal Operating Procedures safeguard your information to maintain chain of custody with the highest levels of integrity and security.
- Confidentiality and Safeguard Measures:
  - All Driven employees sign confidentiality agreements
  - Specific employees are bonded
  - Selected partners carry government clearances

GRAPHICS SERVICES





**CONTACT US**

The Driven Team is on call twenty-four hours a day, seven days a week. We aim to provide you with the best service no matter what the hour and regardless of the project size.

If you have general sales questions please e-mail our sales department and one of our sales associates will get back to you immediately or you can call our office and speak directly to one of our courteous account managers.

Driven leads the way in Electronic Data Discovery by continuing to create proprietary software to solve some of the difficult problems EDD creates.

**Let Driven customize a solution for your next litigation or document management project.**

### MANAGEMENT TEAM

| | | |
|---|---|---|
| **President** | Christine Francis | christine.francis@driven-inc.com |
| **Chief Executive Officer** | Ozzy Jimenez | ozzy.jimenez@driven-inc.com |
| **Chief Information Officer** | Elie Francis | elie.francis@driven-inc.com |
| **Chief Administrative Officer** | Susie Francis | susie.francis@driven-inc.com |
| **Chief Operating Officer** | Mike Jreige | mike.jreige@driven-inc.com |
| **Vice President Of Sales** | Wynter Grant | wynter.grant@driven-inc.com |
| **Customer Service Manager** | Michael Senter | michael.senter@driven-inc.com |
| **Graphics Manager** | Amir Wenrich | amir.wenrich@driven-inc.com |

### CONTACT INFORMATION

| | |
|---|---|
| **Address** | **Virginia Office:** **Driven, Inc.** 6521 Arlington Blvd. Suite 312 Falls Church, VA 22042 |
| | **Washington D.C. Office:** **Driven, Inc.** 1275 K ST N.W. G6 Washington, DC 20005 |
| **Phone** | **Toll Free:** 1.877.637.4836 **Virginia Office:** 703.533.9200 **Washington D.C. Office:** 202.289.8111 |
| **Fax** | 703.533.9110 |
| **Sales** | sales@driven-inc.com |
| **Jobs** | jobs@driven-inc.com |
| **Customer Service** | cs@driven-inc.com |

**Graphics Jobs**          graphics@driven-inc.com
**Tech. Support**          techsupport@driven-inc.com

### DEPARTMENT INFORMATION

| | |
|---|---|
| **Sales** | 703.533.9200 x202 |
| **Customer Service** | 703.533.9200 x200 |
| **Graphics Department** | 703.533.9200 x307 |
| **ReproGraphics Department** | 703.533.9200 x136 |
| **EDD Department** | 703.533.9200 x136 |
| **Imaging Department** | 703.533.9200 x136 |



**LAST MINUTE JOB? NEED A QUICK TURNAROUND?**

**Need an affordable solution but don't want to sacrifice quality?**

Come to Driven! You'd be hard pressed to find a provider that offers a wider range of solutions in the print-on-demand market. Whether your needs are based on speed, reliability or budget, Driven has the answer for you. Our qualified team of designers and production personnel can complete your job within the toughest of deadlines, while maintaining quality standards.

**Our Digital Color and Black & White Printing Services:**

Using top of the line equipment, we can provide you with complete solutions for your complex projects or simple fulfillment of a single product, all under one roof.

Our Xerox 6060 and Creo Ripping systems provide the latest in digital print technology and color output. This technology brings all the advantages of digital printing, including fast setup and multipage document control.

Driven's wide range of print solutions will help to meet your deadlines. From full color proposals and brochures to high volume black & white reproductions, Driven we have trained support staff and production capabilities to produce more than 1,000,000 black & white pages and 100,000 color pages per day. Driven provides print-on-demand solutions to bring your project to completion.






**Project management to complete print solutions.**

Flyers          Posters          Stickers          Magnets          Menus

CD Inserts      Business Cards   Books            Magazines         Proposals





**BINDERY AND FINISHING**

**◯ BINDERY AND FINISHING »**

**Our extensive Bindery Department will help you add that finishing touch. Utilizing a wide array of bindery equipment, we offer an endless array of options to finish your job. We'll help you add the pizzazz you're looking for.**



Need 100 books coil bound for your afternoon meeting? No problem. Have 25 Binders you need by lunchtime? Bring it on! We understand that you don't always have the luxury of planning ahead or being prepared days in advance. That's why we offer complete bindery services under one roof. The convenience you need, in the time you have.

**BINDERY SERVICES**

- Cutting, Folding, Perfing & Scoring
- GBC, Plasticoil, Wire-O Binding
- Velo, Acco, and Tape Binding
- Perfect Binding
- Saddle-Stitching/Booklet Making

**LITIGATION SERVICES**



*Various colors, sizes and options are available for our bindery services. Please ask your account manager about these options.*

**CUSTOM BINDER PRODUCTION & ASSEMBLY**

- Hand Insertion
- Stock Tabs
- Custom Tab Production Including:
  - Lamination
  - Specialty Stocks
  - Odd Sizes
  - Full Bleed / Full Color
  - Double Sided
- Extensive Inventory of 3-Ring Binders
  - O-Ring & D-Ring
  - View Binders
  - 1/2" through 6"

**Project management to complete print solutions.**

| Flyers | Posters | Stickers | Magnets | Menus |
|--------|---------|----------|---------|-------|
| CD Inserts | Business Cards | Books | Magazines | Proposals |



**◊ LARGE FORMAT PRINTING »**

**We offer numerous solutions to help make your statement known. Whether you're looking for a Grand Opening banner or want to put your presentation on display, we've got just what you are looking for.**

While we at Driven possess the ability to produce unusually large copies (up to 12.6" x 19.2"), sometimes that just isn't big enough! For those times, take advantage of our Oversize Printing, or Large Format, service.

It's so easy; all you have to do is come up with the occasion. Our Graphic Artists will design your complete signage to say what you want in a BIG way. We can also work with your designers to ensure proper formatting and the highest quality.

If you need something printed and don't have a digital file, we can scan large format as well. Color or Black & White, transparencies and even mounted pieces; from 36" wide to 1/2" thick.

**SIZE & COLOR:**

Depending on your needs we are able to print out your files to whatever size; Color or Black & White.

**MATERIALS:**

- Presentation Matte
- Photo Gloss
- Scrim Vinyl (used for banners)
- Adhesive Backed Vinyl
- Artist Canvas
- Window Sticker
- Light Box
- Magnetic Steel Paper
- and more...

**LARGE FORMAT SCAN:**

- Black & White or Color
- File formats: tif, jpg, or pdf
- Resolution up to 400 dpi

□ **Banners**
□ **Conference Signage**
□ **Event Displays**
□ **Real Estate Signage**
□ **Graphs & Charts**
□ **Artist Paintings**
□ **Door Signs**
□ **Donation Thermometers**
□ **Drawings & Blueprints**
□ **Vehicle Signs & Magnets**



**Project management to complete print solutions.**

| Flyers | Posters | Stickers | Magnets | Menus |
|--------|---------|----------|---------|-------|
| CD Inserts | Business Cards | Books | Magazines | Proposals |



ABOUT US     CONTACT     SERVICES     LOGIN

# MOUNTING AND LAMINATING

### ▶ MOUNTING AND LAMINATING »

**Take advantage of our many mounting and laminating options to finish that oversize print of yours. Whether we print it or not, we'll take your print and finish it to fit your exact needs.**

From mounting on foam core to applying a UV laminate, we'll apply the finishing touch needed to make your print last. Best of all, these services are available for any size piece, not just oversize

LITIGATION SERVICES



## MOUNTING OPTIONS:

- Form Board (Black or White)
- Gator Board (Black or White)
- Coroplast (White)
- Sintra (Black)
- Acrylic

*Our standard colors are noted beside options.*
*Additional colors are available, typically with an additional day to finish.*



## LAMINATING OPTIONS:

- UV Laminates
- Gloss, Satin and Dull Finishes
- From 1.5 mil to 10 mil
- From Business Card Pouches to 54" Rolls

## VALUE ADDED SERVICES:

- Grommets for hanging
- Edge Trim to finish your display
- Velcro for Displays or Signs

**Project management in complete print solutions.**

Flyers     Posters     Stickers     Magnets     Menus

CD Inserts     Business Cards     Books     Magazines     Proposals



## SCREEN PRINTING & HEAT PRESS

That's right, Driven offers Screen Printing & Heat Press services. You have nearly unlimited options in products. From T-Shirts to Mouse Pads and from single color to four color process, we can do it.

Here are just a few of the possible items you can have produced...

T-Shirts, Baby-Doll Shirts, Sweat Shirts, Towels, Hats, Mouse Pads, Tote Bags and even signage.

**LITIGATION SERVICES**



### STICKERS/LABELS

We do Stickers. Ranging from labels on rolls to oversize window stickers, we have the solution you need. With custom, quick turnaround and standard roll labels, your options are many. Just ask about your many options in paper stock and color, durability, ink colors, over-laminates and adhesives.

### MAGNETS

Need to put your name in your customer's home? Want your information at their fingertips? Do it with a magnet. We offer custom magnets from business card size to vehicle size. Your options are limited only by your imagination. Some suggested uses are business card magnets, calendar magnets, and magnetic signs for the side of your car, van or truck.

For our many other specialty products available, please contact your account manager to see what more we can offer you.

**Project management to complete print solutions.**

| Flyers | Posters | Stickers | Magnets | Menus |
| CD Inserts | Business Cards | Books | Magazines | Proposals |





**VALUE ADDED SERVICES »**

### VARIABLE DATA AND VARIABLE IMAGING

Variable Data technology has been around for quite some time, but the ability to seamlessly integrate it into the printing process is just beginning to blossom. DRIVEN has the ability to do just that.

Whether you want to simply merge address information from your database or want to use an actual signature that changes from record to record based on an account manager or other fields, we can do it. We can even do it in color!

**LITIGATION SERVICES**



### GRAPHIC DESIGN

Our qualified graphic design team is available to provide you with expert advice and design services. We have the latest in all design software systems; carry extensive clipart and image libraries; and have more fonts than we can possibly list!

*Ask your account manager about these and other value added services so that we may tailor our services to meet your needs*

**Project management in complete print solutions.**

| | | | | |
|---|---|---|---|---|
| Flyers | Posters | Stickers | Magnets | Menus |
| CD Inserts | Business Cards | Books | Magazines | Proposals |



Advancing Litigation Through Technology



## Introduction to Driven

Thank you for your interest in Driven, Inc. Whether this is the first time you have heard of Driven, or if you are one of our valued customers, we appreciate your interest in our services.

As you look through the materials in this folder you will discover that we have dramatically expanded our company to provide a wide range of capabilities to support the litigation market. Many of these capabilities are also valuable to customers outside of the legal field and we look forward to providing the same high level of quality and service to clients in any industry.

We strive to offer the "total package" when it comes to litigation support service. We are currently experiencing tremendous growth and interest as we expand to serve clients across the nation. Thanks again for taking the time to look over everything Driven, Inc. has to offer. We look forward to serving you for years to come.

Sincerely,

Christine Francis
President
Driven, Inc.

6521 Arlington Blvd, 312 Falls Church, VA 22042
Phone: 703.533.9200 Fax: 703.533.9110

# Capabilities

# Conversion

DRIVEN is one of the industry leaders in electronic data conversion. Our experienced team of data experts and state of the art processing facility are unmatched in the legal industry. With in-house programmers and seasoned data analysts, we have the knowledge and horsepower to handle your most challenging conversion projects.

## EMAIL FORMATS

### LOTUS NOTES NSF

DRIVEN is able to convert NSF files in their native format rather than shifting the data to Outlook PST's. This feature assures the integrity of the document creating fewer authentication problems later in the case. Our process converts not only the email messages, but the calendar entries and contacts as well.

Few vendors have shown more than a passing familiarity with Lotus Notes - which is the email system of choice for some of our largest clients. DRIVEN could not only manage its digital discovery process against a Lotus Notes mailbox, but also produced an accurate Introspect IDx load file. The output DRIVEN provided deserves special note, as it matched exactly the requirements set forth by agreement between the parties in our largest matter involving Lotus Notes data - emails messages printed to TIFF with all embedded graphics intact, and all attachments in their native format.

- National Law Firm

### MICROSOFT OUTLOOK PST

DRIVEN takes a comprehensive approach to capturing all data involved in email attachments. We are able to preserve the link between the email messages and their associated attachments. Our custom built conversion software goes far beyond the industry standard plug and play programs.

### OTHER FORMATS

As an industry leader, DRIVEN has been asked to work on some of the most challenging cases. Our exposure to projects involving uncommon email platforms such as Groupwise and RFC822 has made DRIVEN the single source for all of your conversion projects.

## NATIVE FILE FORMATS

### MICROSOFT EXCEL

One of DRIVEN's major competitive advantages is our custom Microsoft Excel prep software. We have automated such tasks as removal of blank pages, removal of auto-dates, and other tedious advanced re-formatting options.

### UNCOMMON FILE FORMATS

DRIVEN's data consultants are experts in converting those little known applications and file formats. Our software experts are able to write conversion programs on demand for over 250 file formats. Where our competitors off-the-shelf programs fall short, DRIVEN is able to complete the job no matter what the challenge.



# Electronic Data Discovery

**DRIVEN is a major provider of document discovery, production, and other litigation support services. With custom applications for searching, de-duping, and data conversion, we have revolutionized the way the legal industry deals with the electronic discovery of data. DRIVEN's ability to save you time and money can dramatically increase your success in litigation.**

DRIVEN recognizes that the requirements for each case are unique. By providing both consultation and quality control, we are able to ensure an efficient and accurate product in every phase of the production process. DRIVEN's process consists of the following steps:

1. Data provided by client or harvested by DRIVEN's experts
2. Data restoration
3. Analyze data
4. Extract only specified, tiered information to high-speed media
5. Reduction of data size (D-dupe, D-Search, D-Code)
6. Excel preparation (If needed)
7. Conversion to specified format
8. Load file preparation (Including custom files if needed)
9. Production (Electronic or paper)

As a leader in Electronic Data Discovery, Driven is on forefront for advancing de-duplication technology. Our mastery of the Lotus Notes and Outlook platforms has led us to develop the capability to de-duplicate across NSF, PST, and native files simultaneously. This can done by custodian or across the entire data universe on a rolling basis.

DRIVEN's custom searching capability allows you to review only the data that is most relevant. Our experts are able to use some of the most advanced search tools available to provide accurate and efficient queries.

Web hosting if needed, with *secure* online review capabilities.

**The capability to de-dupe and search effectively can save you an incredible amount of time and resources. Your document reviews will be more consistent and accurate by avoiding multiple reviews of the same document.**

## ADDITIONAL SERVICES:

- Custom Load Files
- Data Consulting
- Endorsement/Branding of images
- Data Hosting
- Data Restoration





# Digital Services

## BLOWBACK

DRIVEN has the capability to print over 200 file types and extensions. The most common files include:

- Image Files (.tif, .jpg, .gif)
- Text Files (.txt, .rtf)
- Web Pages (.html, .xml, .php)
- Word (.doc)
- Excel (.xls)
- Power Point (.ppt)
- Access (.mdb)
- Outlook (.pst, .msg, .vcf)
- Adobe Acrobat (.pdf)
- Word Perfect (.wpd)
- Lotus Notes (.nsf)
- Zipped Files (.zip, .ace, .tar, .sit)

## DIGITAL BRANDING

DRIVEN has the capability to electonically brand and watermark with no character or location limitations tif, pdf, and jpegs.

## SCANNING

### SCANNING PLATFORMS
- Ipro
- LAW
- Doculex
- Ribstone

## EXPORT FORMATS AND FILE TYPES
- Single/Multi Page TIF
- Single/Multi Page PDF
- CaseMap
- Concordance
- Delimited Text
- Doculex
- dtSearch
- Indata Trialdirector
- Inmagic's DB/Textworks
- Introspect eCM
- Ipro
- JFS Litigators Notebook
- LaserFiche
- OmniDocs
- Ringtail
- Sanction
- Summation Blaze
- TotalVz
- Storm
- Lextranet
- **Custom Load Files**

## AUTO CODING

## OBJECTIVE CODING

## DOCUMENT CODING WITH OMR - (Optical Mark Recognition)
- Custom OMR form design
- Forms may contain fields that are single, multiple, list and/or boolean values.
- OMR Forms are bar-coded with unique control numbers for document/database management
- Hand written notes can be added to the OMR forms



# Technical Consulting and Project Management



## ELECTRONIC EVIDENCE PROFESSIONAL CONSULTING

As an extended service, DRIVEN provides its clients with both technical consulting and project management.

## TECHNICAL CONSULTING

Our in-house technology experts are directly available to answer any questions or concerns about the best practices on how a project is or should be produced.

DRIVEN has technicians available for on-site visits.

DRIVENls technicians are experts in the identification, retrieval and conversion of electronic media.

Our technology expertise allows us to customize solutions for our clients while keeping the integrity of the data.

## PROJECT MANAGEMENT

DRIVENls staff specializes in litigation support to help our clients find the most efficient solution to their problem.

Project Managers assigned to client projects will closely manage and update job progress.

DRIVENls Project Managers will allow for clear project communication, precise project instructions and meticulous quality control.

Our extensive training program assures our clients that our project managers can efficiently handle even our most technically demanding projects with deadline compliance.

Litigation and technology will forever be intertwined. It is the goal of DRIVEN to stay at the crest of this realism in order to best support our clients.



# Graphics



## DIGITAL PRINTING, GRAPHICS & PUBLISHING

**On-Demand Printing - Brochures & Sell Sheets - Postcards & Flyers - Newsletters - Book Production -**
**Conference & Training Manuals - Custom Marketing Packages & Proposals - Variable Data Mailings**

Xerox 6060 and Xerox 2045 - 4 Color & High Speed B&W Digital Press
Creo-Scitex Rip w/ FAF Trapping, PDF Softproofing, and Variable Data Engine
Mac and PC Platforms Fully Supported
Full Bindery Service - Cutting, Folding, Scoring and Perfing
Latest Software including Adobe, Macromedia, Corel, QuarkXPress, MS Office Suite
Full Service Desktop Publishing, Layout, Design, and Database Integration (Variable Data)

## COLOR OVERSIZE PRINTING & FINISHING

**Trial Exhibits - Tradeshow / Conference Displays & Signage - Banners - POP Displays - Posters -**
**Vehicle Graphics - Oversize Prints and Reproductions**

2 HP DesignJet UVink 1200 DPI Oversize Printers that print up to 60ʺ wide by 300ʹ
Banner materials including: Lexan, Vinyl, PolyMesh, Canvas, and Drop-Net
Mounting on Foam Board, Gator, Sintra, Vinyl and Coraplast
Lamination of boards & prints with: Matte, Glossy, UV Lustre, Lexan, and Dry Erase
Edge Trim Framing - Multiple, Stock Colors
Golf and Campaign Signs
Custom Magnetic Oversize Boards and Magnets

## STICKERS - SCREEN PRINTING - APPAREL

**T-Shirts - Apparel - Promotional Items - Bumper Stickers - Window Stickers - POP Displays - Posters**

Full Color Stickers with UV Gloss Laminate
Custom Multi-Color Screen Printing on Textiles (Apparel) and Vinyl Sticker Substrates
Full Color Transfer Prints (Including Photographic) for Textiles and Stickers
T-Shirt & Sticker Design

# Hard Copy

## COPYING SERVICES

Legal Copying
High Speed Duplicating
Binder & Book Reproduction
Color Copying
Color and Black & White Large Format Production
Customized Projects
Black & White - Heavy Litigation to Straight Run
Color - Full Color on a Variety of Stocks
Long Run - Custom Binders, Books, Custom Tabs

## CUSTOM PRODUCTION AND ASSEMBLY

Hand Insertions
Custom Tab Production and Lamination

## LABELING

Bates Labeling - Black and White or Color

## BINDERY SERVICES

DRIVEN offers an experienced team charged with creating professional and effective bindery type products.

| | |
|---|---|
| GBC | Perfect Binding |
| Wire-O | ACCO |
| Tape | Saddle-Stitching |
| Plasticoil | |
| Velo | |

## MEDIA DUPLICATIONS

We are able to duplicate and convert to many media types and various file types on the media.

| | | |
|---|---|---|
| Audio | CD | Hard Drives |
| Video | DVD | |

## DOCUMENT DESTRUCTION

Certified or Uncertified


DRIVEN, INC.
A SOLUTIONS BASED COMPANY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEX, INC. t/a LEX ON DEMAND          *

       Plaintiff          *

  v.          *          CIVIL ACTION NO.

DRIVEN, INC., et al.          *

       Defendants          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## AFFIDAVIT OF LYNDA ANDERSON

1.     I am a witness of lawful age having personal knowledge of the facts related herein. I understand that this affidavit may be used to support motions and relief related to the employment contract between LEX, Inc. t/a LEX On Demand ("LEX") and Stephen Mole.

2.     I am the Managing Partner of LEX's Washington, D.C. office. As Managing Partner, I oversee the operations of the office and I am responsible for the performance of the office. As a Sales Consultant, Mr. Mole was one of the employees who worked under me.

3.     LEX is the premiere nationwide document management and processing partner for law firms and legal departments seeking innovative, customized solutions along with service and support excellence in the Washington, D.C. area. We are a perfect marriage of litigation support service offerings in one location: traditional paper discovery services, eDiscovery processing, collections and data harvesting, data repository and storage, blow-back to paper, imaging, OCR and coding, high volume copying, and print on demand.

4.      A key to our success has been that we offer a consultative project management approach with a team that comes from the legal community charged with developing and monitoring the project from inception to completion.  Through continuous feedback from our clients, we enhance and expand our solutions to meet their needs.  We thus customize the overall project from start to finish.  Residual services result from ever changing demands and requirement of the production due to specifications or just plain deadlines.

5.      Although our marketing material emphasizes the customizable options to our solutions, until a client works with us they will never realize the exact appreciation of our nimbleness and flexibility.   Once anointed, they become repeat customers and LEX becomes an extension of their workplace, whether law firm or corporation.

6.      Our processing protocols are established much like an apprenticeship where tasks need to be mastered before personnel can graduate to the next step.  Although our processing must be standardized to maintain chain of custody and defensibility, our front end and back end creativity when working with unique data sets and project scenarios hallmarks LEX as a unique litigation solutions provider.

7.      Our success is our people and how they interface in the work space.  Our workflow coordination is unique to every client and not imposed as a cookie cutter template.  We blend into the project with the client.  If the client likes our approach, they adopt the processing methods and deliverable specifications for on-going and future projects.  If a change is required often as a result of a post mortem conducted by (in which Mr. Mole would participate), suggestions are made for the next project or client.

8.      This industry continually wrestles with the commoditizing and standardization of electronic processing. LEX's proprietary software allows us the capability of making software adjustments to meet specific client needs. If, for instance, software is restricted from real time scripts to react to different demands, then an "off the shelf" software package imposes limitations on the client's processing abilities and ultimately costs the client more on the back end as they try to handle the cookie cutter deliverable. Our people can tweak and utilize various tools to work through a solution while still maintaining defensibility. Our systems and software have a single backbone where various extensions run off this backbone allowing for married options to be employed in a networked menu set-up. This service platform affords LEX direct relationships and tie-ins to our billing, project status updates, and personnel time keeping, ultimately providing tools and records for LEX to make smarter business decisions by evaluating each project.

9.      Mr. Mole was one of LEX's top producing Sales Consultants in the Washington, D.C. office. As a Sales Consultant, Mr. Mole was intimately familiar with the full spectrum of LEX's services and capabilities. He also developed extensive personal contacts among LEX's law firm and corporate clients.

10.     Having Mr. Mole work for a competitor in any capacity poses a severe threat to LEX's competitive advantages. The inroads he made into various LEX clients that he served, the familiarity with the needs and idiosyncrasies he developed, the knowledge of ongoing and impending projects he acquired, and the personal relationships he established in providing services to those clients, will take time for LEX to replace. Taking that knowledge and experience to a competitor robs LEX of the good will it has paid to establish.

11.    In addition, Mr. Mole regularly participated in staff meetings where marketing strategies were discussed, as well as problems in ongoing projects. He learned the contacts developed by other Sales Consultants in the law firms they serviced, as well as their strategies for developing more contacts within those firms. He participated in discussions where impending projects were discussed, issues associated with current projects were vetted, the needs and idiosyncrasies of other consultants' clients were related, thus giving him an insiders' knowledge of LEX's current clients in the Washington, D.C. area and where LEX intended to target its efforts for further growth.

12.    LEX rivals much larger competitors in the Washington, D.C. market because of the breadth and flexibility of the services we offer. Some of what we can do is obviously part of our marketing efforts. How we do it, however, is confidential and proprietary information that LEX works to protect. One way the company seeks to protect that information is to require our Sales Consultants to agree that part of the consideration they provide for their employment is an agreement to refrain from working for a competitor in our market area for a period of two years. Mr. Mole made that agreement when he worked for LEX.

13.    If Mr. Mole works for a competitor in violation of his agreement, it poses a severe threat to LEX. He can take immediate advantage of the client contacts he developed while working with LEX. Even if he does not make the solicitation directly, by directly or indirectly (as in having a Driven sales consultant tell the client that Mr. Mole now works for Driven) letting the LEX client know that he works for the competitor, Mr. Mole is effectively soliciting that client to switch to the competitor. Moreover, the confidential information he possesses, described above, could enable a competitor to enhance its service offerings, essentially stealing what it has taken LEX years to develop.

4

In accordance with 28 USC § 1746 I declare under penalty of perjury that the foregoing is true and correct.

04.16.07
_____
DATE

_Lynda Anderson_
LYNDA ANDERSON

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), made as of _September 25th_ , 20 _03_, by and between Lex, Inc., a Delaware corporation with its principal office at 1225 New York Avenue, N.W., Washington, D.C. 20005 (the "Company") and Stephen Mole, an individual residing at _1600 Spring Gate Dr #2312, McLean VA 22102_ (the "Employee").

1.  <u>Definitions.</u>

a.  Customer or account, as used herein, shall mean the business entity with whom the Company transacts business.

b.  Customer contact or account contact, as used herein, shall mean the individual representative, employee, partner, principle, or agent of a customer or account with whom Employee interacts in transacting business or soliciting business.

c.  Contact or communication, as used herein, shall mean intercourse of any kind between the Employee and another individual(s), whether, verbal, written, or otherwise, for the purpose of providing copy services or the solicitation of copy services.

d.  Assigned Territory, as used herein, shall mean the Washington, DC Metropolitan Area, including the District of Columbia and Arlington, Fairfax, Loudon and Prince William Counties and the City of Alexandria, Virginia and Montgomery, Prince Georges, Howard and Charles Counties, Maryland.

2.  <u>Employment.</u> The Company, which includes all subsidiaries and affiliates, employs the Employee and the Employee accepts employment upon the terms and conditions of this Agreement. If the Employee is promoted, demoted, transferred, or re-assigned to another position, this Agreement survives that employment action.

3.  <u>Term.</u> This Agreement shall be terminable at the will of each party. Employee shall provide fourteen (14) days advance written notice to the Company when employee desires to terminate the employment relationship. Employee shall be entitled to compensation only for such time as Employee provides full-time and exclusive services to the Company, as described herein. If Employee elects to terminate employment, the Company, at its option, may immediately terminate Employee's employment without allowing for the additional fourteen (14) days to elapse.

4.   <u>Compensation</u>.  In consideration of the services to be rendered by the Employee under this Agreement, the Company shall pay the Employee the amount set forth in Exhibit A attached hereto and made a part hereof.  Such compensation shall be subject to withholding and other applicable taxes.  Employee's compensation may be increased or decreased by the Company, at the sole discretion of the Company.

5.   <u>Duties</u>.  The Company shall employ the Employee as a Sales Consultant. Employee shall comply with the obligations set forth in this Agreement and with Company policy, whether or not reduced to writing, to the extent Company policy is not inconsistent with the terms of this Agreement.  Employee's primary duty shall be to assist the Company in becoming the best, most successful, copy services provider in the Employee's Assigned Territory.  Employee's duties therefore include all tasks, assignments, and activities in furtherance of the primary duty.  Employee will be responsible for, among other things, developing a sales and marketing plan for the assigned territory; soliciting new business with existing customers; soliciting new business from new customers; making sales calls and visits to existing customers and prospective new customers; coordinating job pick-ups and deliveries with Account Managers; performing job pick-ups and deliveries when necessary; resolving customer complaints; assisting all Company employees in providing the highest level of customer service; and all other duties required by the Company.  It is expressly understood that Employee's communications with any customer contact, including partners, principles, employees, agents, and representatives of any account, have as their ultimate purpose or goal the solicitation and/or servicing of all of the copy service business of that account for the Company in furtherance of Employee's duties hereunder.

6.   <u>Duty of Loyalty</u>.  The Employee shall devote his or her entire time, energy and attention to the Employer's business.  During the term of employment, Employee agrees not to engage in any other business activity, regardless of whether it is pursued for gain or profit.  Employee further agrees not to pursue or be connected with any business which is in competition with the Company or its affiliates or subsidiaries during the term of employment.

7.   <u>Sales Subject to Acceptance</u>.  All sales made by Employee shall be made subject to acceptance by the Company, and all contracts for the Company's services shall be executed by a duly authorized officer of the Company.  No credit or other financial decisions relating to the Company's sales or business shall be made by Employee.

8.   <u>Probationary Period</u>.  All new employees are hired on a ninety (90) day probationary basis.  The Company may, however, extend the probationary period up to an

additional ninety (90) days. Employee will be informed if the probationary period is to extend beyond the first ninety (90) days. In addition, the probationary period will be extended by the number of days Employee is absent from scheduled work while in a probationary status. Employee may choose to resign, or may be terminated by the Company, without notice at any time during the probationary period. Upon termination, a probationary employee will be paid the pay earned to the date of termination. An employee who successfully completes the probationary period is entitled to the benefits of a regular (non-probationary) employee. However, employment is terminable by either the Company or Employee at any time, at will, both before and after the probationary period. Employee will not be paid for absences that occur during the probationary period or the extended probationary period.

9.    Representations and Warranties. Employee represents and warrants that he or she is not a party to any agreement with any third party containing a non-competition provision or other restriction that would preclude any part or all of Employee's employment with the Company or any of the services which Employee will provide to the Company. Moreover, Employee represents and warrants that he or she is not limited by any court order or other obligation from performing all assigned duties for the Company. Employee understands that this is a condition precedent to any employment offered by the Company and that Employee agrees herein that he or she will indemnify and hold harmless the Company for any legal action taken against the Company as the result of any agreement with a prior employer, including reimbursing the Company for any legal expenses incurred in defending such action.

10.    Covenant Not to Compete.

a.    The Company undertakes to train and to continue to train Employee and to impart to Employee confidential information and knowledge about the Company's business strategies and policies, accounts, customer lists, trade secrets, procedures, and methods. The Company has established a valuable and extensive business in its service, which business has been developed at a considerable expense to the Company. The nature of the business is such that the customer relationships and goodwill that the Company has developed must be maintained through close personal contact of its Employees with the contact person(s) at the particular account or customer.

b.    By virtue of Employee's employment with the Company, Employee will become familiar with and have access to the manner, methods, trade secrets, and confidential information pertaining to the Company's business, and with the names and lists of customers and customer contacts. During Employee's employment with the Company, Employee is being compensated in part for developing and maintaining

-3-

relationships and good will with customers, prospective customers, customer contacts, and prospective customer contacts of the Company. It is understood that Employee will become personally acquainted with the Company's customers, their business requirements, the amount paid by them for the Company's services, and the contact persons at the particular account or customer.

c.    For a period of two (2) years after the termination of employment, whether with or without cause, whether voluntary or involuntary, the Employee shall not, either directly or indirectly, on Employee's own behalf or in the service of or on behalf of others, (i) engage in any competing business activity within the Employee's assigned territory; or (ii) contact, cause to be contacted, or communicate with any specific accounts or customers for which Employee was responsible or whom Employee had contact during his or her employment with the Company. Such contact is prohibited only to the extent that it is adverse to the interests of the Company or would benefit or potentially benefit any competitor or potential competitor of the Company, and further, nothing contained herein shall prevent Employee from engaging in any activity that is not competitive with the business then being conducted by the Company. Employee understands and agrees that the Company has a legally protectable interest in the relationships and good will it has developed with its customers through Employee and other employees, in the relationships and good will it has developed with individual contact persons at each of its customers, in its customers themselves and its business with them, including that business which the Employee developed or for which the Employee had responsibility.

d.    In the event of a breach of any provision of Section 10 by Employee, Employee agrees that the Company shall be entitled to an injunction prohibiting conduct in breach of this Agreement. Employee acknowledges and agrees that a breach of Section 10 will result in immediate, actual, irreparable injury to the Company. Employee further acknowledges and agrees that it is impossible to determine with any reasonable accuracy the financial injury that could and/or would result by actions in breach of Section 10.

e.    It is understood and agreed that part of the consideration for Employee's employment and/or continued employment with the Company is this Agreement not to compete. It is also understood and agreed that one goal of the period of non-competition is to allow the Company to re-establish the personal relationships with customers and customer contacts developed and/or nurtured by Employee during his or her employment with the Company. In the event of a breach of Section 10 by the Employee, the Company shall be entitled to liquidated damages as defined herein. For each customer or account of the Company that Employee contacts, causes to be contacted, or otherwise works with or for in violation of this Section 10, Employee shall pay to the Company liquidated damages in the amount of the average monthly billing by the

-4-

Company to that customer or account times the number of months remaining in Employee's Covenant Not to Compete, to be determined from the date of the initial contact made by the Employee to that customer or account. The average monthly billing shall be the average billing to that customer or account by the Company's office where Employee worked during the twelve (12) months preceding Employee's termination. The parties agree that it is impossible to ascertain with any reasonable accuracy the amount of prospective damages to the Company resulting from a breach by the Employee of this Section 10, which damages would include business lost to the Company for a period of time well beyond the two year term specified in this Section 10. The parties further agree that the damages set forth above are reasonable, and not a penalty, based upon a conservative estimate of the value, or a portion of the value, of the loss of the customer or account in question, in addition to a loss of good will.

11.    <u>Non-Solicitation of Employees</u>.

       a.    For a period of two (2) years after the termination of employment, whether with or without cause, whether voluntary or involuntary, the Employee shall not, either directly or indirectly, on Employee's own behalf or in the service of or on behalf of others, solicit, divert, recruit or employ any employee of the Company, including any of its subsidiaries or affiliates.

       b.    In the event of a breach of this Section 11 by the Employee, the Company shall be entitled to liquidated damages as defined herein. For each former employee of the Company solicited, diverted, recruited, or employed or caused to be in violation of this Section 11, Employee shall pay the Company liquidated damages for each account or customer of the Company which such former employee handled for the Company during the two (2) years immediately preceding termination of that former employee and which customer or account the former employee contacts or otherwise services or works with for the benefit of Employee or anyone in privity with Employee. The liquidated damages for each such account or customer shall be (i) the amount of billings by the Company to the customer or account during the twelve (12) months immediately preceding termination of such former employee with the Company, and (ii) the amount of the first six (6) months' salary paid to the replacement(s) for the former employee. If the former employee was not in a position to have accounts, Employee shall pay the Company the amount of the first six (6) months' salary paid to the replacement(s) for the former employee.

       c.    The parties agree that it is impossible to ascertain with any reasonable accuracy the amount of prospective damages to the Company resulting from a breach by the Employee of this Section 11. The loss of an employee creates a hardship

-5-

and burden on the Company, for which the Company suffers substantial harm. The Company must expend funds to search for a replacement employee and train that employee. Further, the loss of the overall efficiency of the office as the result of an employee leaving cannot be quantified. Consequently, the parties agree that the liquidated damages set forth above are reasonable, and not a penalty, based upon a conservative estimate of the value, or a portion of the value, of the former employee to the Company.

      d.    In the event of a breach of any provision of Section 11 by Employee, Employee agrees that the Company shall be entitled to an injunction prohibiting conduct in breach of this Agreement. Employee acknowledges and agrees that a breach of Section 11 will result in immediate, actual, irreparable injury to the Company. Employee further acknowledges and agrees that it is impossible to determine with any reasonable accuracy the financial injury that could and/or would result by actions in breach of Section 11.

    12.   <u>Non-Disclosure of Confidential Information</u>.

      a.    The Company is committed to preserving and protecting confidential and proprietary information and trade secrets (collectively "Confidential Information") to the full extent permitted by law. During the term of employment, Employee will have access to and become familiar with such Confidential Information of the Company. All confidential information is the exclusive property of the Company. Confidential Information includes, but is not limited to, devices, secret inventions, processes and compilations of information, records, specifications, customer lists, price lists, customer proposals, advertising and marketing plans, business plans, all computer information designed by or developed for the Company, or any confidential knowledge or secrets with respect to the business of the Company.

      b.    In consideration of employment, Employee acknowledges an obligation not to disclose Confidential Information to any third party, directly or indirectly, or use Confidential Information in any way that is adverse to the Company, either during or for a period of five (5) years after the term of employment. Use of Confidential Information during the term of employment is restricted to that use necessary for the performance of Employee's duties.

      c.    Upon termination of employment, Employee shall return to the Company all Confidential Information, including, but not limited to, data, records, customer and product lists, notes, correspondence, or any other documents or copies thereof, which came into Employee's possession and are related to the Company's business.

13.    <u>Injunctive Relief</u>. To the extent permissible by law, the Company shall be entitled to injunctive or other equitable relief in the event of a breach or threatened breach by Employee of any of the covenants contained in this Agreement.

14.    <u>Waiver of Breach</u>. The failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be construed as thereafter waiving any such terms and conditions, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

15.    <u>No Assignment</u>. This Agreement and the rights, interests and benefits hereunder shall not be assigned, transferred, pledged, or hypothecated in any way by Employee or any executor, administrator, heir, legatee, distributee, or other person claiming under Employee and shall not be subject to execution, attachment, or similar process. Any attempt by Employee to assign, transfer, pledge, or hypothecate or otherwise dispose of this Agreement or such rights, interest and benefits, or the levy of any attachment or similar process thereupon shall be null and void and shall relieve the Company of any and all liability hereunder.

16.    <u>Attorney's Fees</u>. If the Employee makes a claim against the Company associated in any way with his employment at the Company and the Company prevails, in whole or in part, on that claim, or if the Company succeeds in whole or in part in a claim against Employee for breach of this Agreement, the Company is entitled to recover reasonable attorney's fees and other litigation costs, including costs associated with retaining the services of expert witnesses.

17.    <u>Severability and Reformation</u>. If any provision of this Agreement is held invalid by a court of competent jurisdiction, such holding will not invalidate any of the other provisions herein, as it is intended that the provisions of this Agreement shall be severable and that the invalidity of one shall not invalidate the others. Notwithstanding the foregoing, if it should ever be held that any provision contained herein does not contain reasonable limitations as to time, geographical area, or scope of activity to be restrained, then the court so holding shall, at the request of the Company, reform such provisions to the extent necessary to cause them to contain reasonable limitations as to time, geographical area and scope of activity to be restrained and to give maximum permissible effect to the intentions of the parties as set forth herein, and the court shall enforce such provisions as reformed.

18.    <u>Governing Law</u>. It is agreed by the parties that the law of the State of

Maryland will govern the interpretation, validity, and effect of this Agreement.

19.    Counterparts.  This Agreement may be executed in multiple counterparts, and by the parties by separate counterpart, each of which shall be deemed an original and all of which together shall constitute one instrument.

20.    Entire Agreement.  This Agreement supercedes any prior Agreements between the Employee and the Company, as well as any other statements or representations of any kind.  Employee and the Company hereby agree that this Agreement constitutes the entire agreement between the parties with respect to Employee's employment with the Company.  No changes or amendments to this Agreement shall be effective unless in writing and signed by both parties.  This Agreement shall bind the parties, their successors and assigns.

IN WITNESS WHEREOF, the parties have affixed their signatures to this Agreement to be effective on the day and year first written above.

LEX, INC.                                          EMPLOYEE

By: _Kathleen A Mal_____              _____

Name: _Kathleen A. Maloney___         Name: _Stephen P. Mole___

Date: _9/25/03_____          Date: _9/25/03_____

-8-

# Thomas & Libowitz, P.A.

A Professional Association founded in 1975

STEVEN ANARGYROS THOMAS+*
MICHAEL S. LIBOWITZ
ROBERT A. SNYDER, JR.
ROBERT J. LYNOTT+
JOHN R. WISE
CLINTON R. BLACK, IV
C. WAYNE DAVIS
MICHAEL J. COLLINS+
FRANCIS R. LAWS
CHARLES B. JONES
LOUIS J. EBERT+ * ^
WILLIAM L. HALLAM+ " ·

COUNSEL
BASIL A. THOMAS
BARRY D. BERMAN
JOHN R. PALIGA** ~

100 Light Street , Suite 1100 • Baltimore, MD 21202-1053
Phone: (410) 752-2468  • Fax: (410) 752-0979

1105 Market Street, Suite 300  •  Wilmington, DE 19801
Phone: (443) 386-1152

www.tandllaw.com

MARGARET L. ARGENT+
SARA A. LEVINSON
LISA A. OLIVIERI
PATRICK J. MADIGAN+
MATTHEW J. GALLAGHER
MUNACHI O. NSOFOR
ANASTASIA E. THOMAS

ALSO MEMBER OF DC BAR  +
ALSO MEMBER OF VA BAR  *
ALSO MEMBER OF WVA BAR  -
ALSO MEMBER OF PA BAR  "
ALSO MEMBER OF DE BAR  ^
ALSO  MEMBER OF OHIO BAR  **
ALSO MEMBER OF TEXAS BAR  ~

April 11, 2007

*Via Email and Certified Mail, Return Receipt Requested*

Ms. Christine Francis
President
Driven, Inc.
1275 K Street, NW G6
Washington, DC 20005

*Via Regular Mail and Certified Mail, Return Receipt Requested*

Mr. Stephen Mole
21926 Bayard Terrace
Broadlands, VA 20148

   **Re:**  **Employment Agreement**

Dear Ms. Francis and Mr. Mole:

   This firm represents LEX, Inc., Mr. Mole's former employer.  Mr. Mole's employment with Driven, Inc. is a direct violation of the terms of that agreement.  By this letter, LEX demands that such breaches cease and desist immediately.

   Mr. Mole's contract prohibits both disclosure of confidential company information and working for a competitor.  Mr. Mole is in violation of both provisions.  His knowledge about LEX's capabilities and its customers' preferences, particularly as it pertains to electronic discovery, are extremely sensitive and proprietary.  LEX is prepared to use its best efforts to enforce its rights under the law to protect these assets, as well as the other interests protected by the contract.

   Please forward to the undersigned a written confirmation that Mr. Mole has ceased his violation of the contract by no later than close of business Friday, April 13.  If we do not have such written assurance by Friday, we will be in the Superior Court of Washington, DC, Monday morning seeking a Temporary Restraining Order.

Ms. Christine Francis
Mr. Stephen Mole
April 11, 2007
Page 2

Thank you for your anticipated cooperation.

Very truly yours,

Francis R. Laws/sal

Francis R. Laws

cc:    David Tomashefski

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LEX, INC. t/a LEX ON DEMAND      *

        **Plaintiff**      *

    **v.**       *     **CIVIL ACTION NO.**

DRIVEN, INC., et al.      *

       **Defendants**      *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>ORDER</u>

Based upon oral argument and the Motion for Temporary Restraining Order and Preliminary Injunction, it clearly appears from specific facts shown by affidavit that immediate, substantial, and irreparable harm will result to LEX, Inc. before a full adversary hearing can be held, and it is this _____day of April 2007, HEREBY ORDERED that:

     1.      Defendant Stephen Mole is prohibited from directly or indirectly engaging in any business activity that competes with LEX, Inc., including employment with Driven, Inc. or any other business that provides reprographic services, litigation support services, eDiscovery, print on demand, and commercial printing services, within the territory to which Mr. Mole was assigned while working for LEX, Inc., which includes Washington D.C., Arlington, Fairfax, Loudon, and Prince William Counties and the City of Alexandria, Virginia, and Montgomery, Prince George's, Howard, and Charles Counties, Maryland;

     2.      Defendant Stephen Mole is prohibited from directly or indirectly contacting, in any manner, any of LEX's customers for the purpose of soliciting and/or providing to any such customers any information relating to any service or product offered by LEX, or actually soliciting, diverting, or taking away any such customers of LEX;

3.    Defendant Stephen Mole is prohibited from, directly or indirectly, on his own behalf or on behalf of others, soliciting, diverting, recruiting, or employing any employee of LEX, Inc., or any of its subsidiaries or affiliates;

4.    Defendant Stephen Mole shall, effective immediately, stop using the cell phone number 202-369-0062 and take such efforts as are necessary to change the number with his cell phone service provider;

5.    Defendant Driven, Inc., either as a corporate entity or through any of its owners and/or managers, is prohibited from employing, engaging, contracting with, or otherwise participating with Stephen Mole in any capacity which violates this Order.

_____
Judge, United States District Court
For The District Of Columbia

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEX, INC. t/a LEX ON DEMAND      *

       Plaintiff        *

   v.        *     **CIVIL ACTION NO.**

DRIVEN, INC., et al.      *

       Defendants     *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### <u>CONFIDENTIALITY ORDER</u>

The Court finds entry of this Confidentiality Order necessary and appropriate to allow the parties to have reasonable access to information through discovery while providing the parties and third parties with a means for limiting access to, and the disclosure of, confidential, proprietary, or competition-sensitive information and trade secrets produced in this lawsuit.

**IT IS THEREFORE ORDERED** as follows:

1.     Any documents, testimony, and any other information produced or elicited during discovery which contain trade secrets or confidential, proprietary, or competition-sensitive information belonging to any party, including any affiliated companies (hereafter, the "Confidential Information") shall be used and disclosed only as set forth in this Confidentiality Order.

2.     All Confidential Information should be appropriately marked "CONFIDENTIAL" by the party producing same. To the extent Confidential Information is produced by a party without an appropriate confidentiality mark, any party may thereafter designate such information as confidential, so mark, and such information will be treated in accordance with the terms of this Confidentiality Order as if it had at all times been appropriately labeled.

3.      Confidential Information shall be treated as confidential and shall be disclosed only to the following:  (a) the parties; (b) the parties' attorneys; (c) employees and agents of the parties' attorneys; (d) any person retained or employed to assist the attorneys of record in this litigation, including, but not limited to, other attorneys or accountants, statisticians, economists, and/or other experts; and (e) the Court.  Confidential Information may also be shown to non-party witnesses called to testify, but only on the record during the time of their testimony, unless the parties otherwise agree.  Any Confidential Information, including that which is designated as Lawyer Confidential, produced in accordance with Paragraph 1 of this Order shall be used solely for purposes of the prosecution or defense of the above-titled litigation and shall not be disclosed to or discussed with any other parties or persons for any other reason whatsoever.

4.      Confidential Information marked by a party as "LAWYER CONFIDENTIAL" shall be treated as confidential and shall be disclosed only to (a) opposing counsel; (b) opposing counsel's staff required for conduct of the above-titled litigation; (c) independent expert consultants retained or employed to assist the attorneys of record in this litigation; (d) the Court; and (e) certified court reporters taking testimony involving such LAWYER CONFIDENTIAL information and their support personnel.  LAWYER CONFIDENTIAL information may not be shown to any party to this action, affiliates, or the officers, directors, employees, or agents of same except that LAWYER CONFIDENTIAL information may be shown to party witnesses called to testify, but only on the record during the time of their testimony, unless the parties otherwise agree.

5.      With respect to depositions, all transcripts and deposition testimony and, if appropriate, audio and/or videotapes of same shall be treated as Confidential Information in their entirety; provided, however, that once the deposition transcript has been transcribed, each party

2

shall have thirty (30) days following receipt of the transcript to designate confidential portions of the deposition proceedings. Such designations may also be made at the deposition itself. Upon expiration of the thirty (30) day period, only those portions of the deposition so designated shall be treated as Confidential Information, but such designated portions shall be so treated as Confidential Information in accordance with the terms of this Confidentiality Order in any and all formats (i.e., transcript, audio tape, videotape, etc.). Parties may also designate deposition testimony as Lawyer Confidential. In the event that testimony at a deposition involves CONFIDENTIAL Information or LAWYER CONFIDENTIAL Information, all persons not entitled to access to such information will be required to leave the deposition for that portion of the testimony.

6.    Designation of materials as Confidential Information, including LAWYER CONFIDENTIAL, shall not be conclusive as to the confidentiality of such materials. Parties must have a good faith basis for the designation of material as CONFIDENTIAL or LAWYER CONFIDENTIAL. In the event of any dispute over the use of such designation, the aggrieved party may seek appropriate relief from the Court pursuant to this Order. A party shall not be obligated to challenge the propriety of a confidentiality designation at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. This Order shall not be construed as waiving any right to assert a claim of privilege, relevance, or other grounds for not producing documents or materials in discovery. The fact that material is designated under this Confidentiality Order shall not determine or affect what a trier of fact may find to be confidential or trade secrets. No designation or acceptance or any designation pursuant to this Confidentiality Order shall constitute an admission or acknowledgement that the material so designated is in fact proprietary, confidential, competition-sensitive, or trade secret.

3

7.    To the extent that hard drives of computers are delivered to an independent third party expert to copy or make images, said information and hard drives, including copies and images, will be treated as LAWYER CONFIDENTIAL.

8.    Within thirty (30) days of the conclusion of this matter, including any appeal, any party in possession of another party's Confidential Information shall return it or continue to maintain it as confidential as required by this Order, and any party in possession of another party's LAWYER CONFIDENTIAL Information shall return the information to counsel for the appropriate party, including originals and all copies.

9.    This Order shall be binding on all persons receiving Confidential Information, and counsel for any party making disclosure to any person authorized by this Order to receive Confidential Information shall cause such person to read a copy of this Order and sign a compliance agreement in the form attached hereto as Exhibit "A."

10.    Nothing herein shall be construed as preventing any party from making application to the Court for modification of the terms of this Order at any time.

11.    Nothing herein shall be construed as limiting the scope of discovery or as restricting any party's right to discovery under the Federal Rules of Civil Procedure.

12.    Any document filed with the Court that contains Confidential Information shall be filed under seal.

**SO ORDERED**.

**SIGNED** this _____ day of _____, 2007.


_____
Judge, United States District Court
For The District Of Columbia

4

## COMPLIANCE AGREEMENT

I have read and understand the Confidentiality Order, which controls discovery of confidential and/or proprietary information in the captioned case, entered into by the parties on_____.  I agree to be bound by the Confidentiality Order and will not disclose "Confidential Information," as so defined by the Confidentiality Order, to anyone except those persons who are authorized to receive "Confidential Information" under the terns and conditions of the Confidentiality Order.

_____
Signature

_____
Name Printed or Typed

Subscribed and sworn to before me this the _____day of _____ 2007, to certify which witness my hand and official seal of office.

Notary Public, State of _____